MANUEL RAMIREZ V. STATE

No. 27,845. January 11, 1956.
Appellant's Motion for Rehearing Granted March 7, 1956.
State's Motion for Rehearing Denied
(Without Written Opinion) April 25, 1956.

*Ray Stevens*, Austin, for appellant.

*J. R. Owen*, County Attorney, Georgetown, and *Leon Douglas*, State's Attorney, Austin, for the state.

WOODLEY, Judge.

The conviction is for murder without malice, the indictment being drawn under Art. 802 (c) V.A.P.C. The jury assessed the minimum punishment of two years in the penitentiary.

The error assigned is the insufficiency of the evidence to establish the corpus delicti and to support the jury's verdict.

Appellant's counsel, by brief and oral argument, contends that there is not sufficient evidence to corroborate appellant's confession that he was the driver of the automobile, and insufficient evidence to prove that appellant was intoxicated. These contentions will be considered in the order mentioned.

The evidence reflects that on January 22, 1954, at about 2:00 or 2:30 P.M., a green 1952 model Chevrolet was involved in a collision with a 1953 Dodge coupe driven by Mrs. Jewel Reynolds Ruble. Mrs. Ruble was critically injured in the collision and died a few hours after the accident as a result of such injuries. The collision occurred at the intersection of the Mc-Neil Road and U.S. Highway 183, in Williamson County, Texas. Immediately prior to the accident the 1952 Chevrolet was traveling in a westerly direction on the McNeil Road and Mrs. Ruble was driving her Dodge coupe in a northerly direction on U.S. Highway 183. The Chevrolet did not stop at a stop sign facing the McNeil road, but, instead, entered the intersection at a speed of 25 or 30 miles per hour and was driven out onto U.S. Highway 183 and directly in front of the Dodge coupe driven by Mrs. Ruble.

For a distance of some 49 feet before reaching the stop sign on the McNeil Road the view was clear and unobstructed for a distance of some 700 feet south on U.S. Highway 183. Immediately prior to the accident the Dodge coupe driven by Mrs. Ruble was traveling at a speed of about 40 to 45 miles per hour.

Appellant, on March 29, 1954 made a voluntary statement of which the following is a part: "We left Lee's Place and went to the Steak House in Round Rock and I had some beer there. It was about 1:00 or 1:30 when we were at the Steak House. We left the Steak House and went on toward Jollyville. I was sitting in the front seat driving. Ike Mercer and 'Bubba' Harbert were in the front seat with me. Pablo Pena, Epefiano Carrizales and Buck Herbert were sitting in the back seat. We took the old McNeil road from Round Rock, out by the lime kiln. When we came to the intersection of Highway 183, I was going straight ahead. I started across the highway at the intersection and that's when the accident happened. I was driving a light green, 1952 Model Chevrolet Deluxe car. I remember trying to get out of the car because it was upside down. I tried to get out through the window but couldn't so one of the boys pulled me

out. I did not have any alcohol to drink after I left the Steak House and didn't drink anything after I got to the hospital. I voluntarily took a blood test at the hospital."

W. C. Curtner, a truck driver, witnessed the collision. He identified appellant as the occupant of the Chevrolet who had a bad wound on his head and was bleeding in the face.

Any question of the suffiiciency of the evidence to show that appellant was the driver of the Chevrolet car, as he stated in the confession, was removed when appellant offered the following testimony in connection with his Exhibit 1.

"Q. Could you identify this, please sir? A. Yes, sir; this is the view showing the rear end of the car driven by Manuel Ramirez."

Appellant's Counsel: "We offer this in evidence, Your Honor.

"(The picture referred to was received in evidence as Defendant's Exhibit No. 1, and same is hereto attached.)"

Defendant's Exhibit No. 1 shows a rear view of the 1952 Chevrolet resting in an upside down position, at the scene of the collision.

As to the evidence showing that appellant was intoxicated, we have first his confession that he had been drinking.

He received a severe injury as a result of the collision and, when observed by the witness Curtner, was lying down flat on his back and "there was nobody walking around except two of the colored men."

Curtner made it clear that he was not testifying that anyone was drunk, but said that he detected the odor of alcohol on the breath of appellant and all of his companions except one of the colored men whose hand was badly cut.

Appellant was placed in an ambulance and taken to Brackenridge Hospital where, shortly after 5 o'clock, a specimen of blood was taken from him with his consent.

Analysis of this blood revealed an alcohol content of 1.3 milligrams of alcohol per cubic centimeter of blood, or otherwise stated, .13 per cent of alcohol in the blood.

The state's witness, Roland E. Tullis, chemist and toxicologist for the Texas Department of Public Safety, after his qualifications to testify on the subject were established, stated that he made the analysis showing such alcohol content and gave the following testimony:

"Q. * * * If you will explain to the jury the standards that are usually used in determining the point of intoxication, based on the percentage of alcohol in the blood. A. The concentration of alcohol in the blood necessary to cause a person to be intoxicated varies quite widely from one individual to another. Some individuals are intoxicated with concentrations of .6 of a milligram of alcohol per cubic centimeter of blood, while others would not be intoxicated at that concentration. As the blood-alcohol concentration increases, it would affect more individuals. By the concentration of one milligram of alcohol per cubic centimeter of blood, 80 per cent of the individuals who have been tested were intoxicated. By a blood-alcohol concentration of 1.2 miligrams of alcohol per cubic centimeter of blood, 90 per cent of the individuals who have been tested and reported on were intoxicated; and the blood-alcohol concentration of 1½ milligrams of alcohol per cubic centimeter of blood has been found to be high enough to cause all the people who have been tested to be intoxicated; and in my opinion, that concentration is sufficient to cause any person to be intoxicated.

"Q. Now, will you state what organizations you know of that have adopted these standards as being accurate — that standard that you have just stated? A. Well, the interpretation of the blood-alcohol concentration, based on the testing, and the conclusion that the 1.5 milligrams of alcohol per cubic centimeter of blood is sufficient to cause all persons to be intoxicated is recommended for interpretation by the American Medical Association and the National Safety Council.

"Q. Now, you stated in your experiments you had given individuals controlled or measured amounts of alcohol, and then at varying times from the time that they consumed this alcohol, you had made blood tests to determine the amount of alcohol that had been absorbed into the blood. Will you tell the jury about how long after a person has had a drink it takes until all of the alcohol that he has consumed has been absorbed into the blood? A. Well, it requires from forty-five minutes to an hour for all of the alcohol to be absorbed from the stomach and intestine into the blood.

"Q. Then a person who has been drinking beer or any other intoxicant would reach the peak of concentration of alcohol in his blood within forty-five minutes or an hour after his last drink; is that correct? A. Yes, sir, it would require that long after his last drink.

"Q. Explain to the jury the rate of decrease of alcohol in the blood after an individual ceased drinking. A. As I stated, after the individual ceases drinking, as long as alcohol is in his stomach being absorbed—the stomach and intestine—the concentration in his blood is going to be increasing, and after the period of approximately an hour, it will reach a maximum, and then it starts going down, if he doesn't drink any more, and the rate of decrease is fairly constant for the average individual, and that rate is two-tenths of a milligram of alcohol for each hour the alcohol in the body is gotten rid of, partly by excretion through the kidneys, some through the perspiration and breath, and most of it is oxidized or burned inside the body, principally in the liver, and that alcohol as it is used up and excreted decreases at two-tenth of a milligram of alcohol per cubic centimeter of blood each hour until it is all gone.

"Q. Now, assuming that this defendant who had been drinking beer took his last drink at 1:00 to 1:30 P.M. and then was involved in an accident at from 2:15 to 2:30 P.M., and then a blood test was made at five minutes after 5 o'clock, and that at that time the percentage of alcohol in the blood was as stated by you, 1.3 milligrams of alcohol, what would be your opinion as to the amount of alcohol in the blood at the time of the collision—that is, 2:15 or 2:30 P.M.? A. To make sure I have the conditions right, the last drink was swallowed from between 1:00 and 1:30 P.M.?

"Q. That's right. A. The accident happened at 2:15 or 2:30 and the blood specimen was drawn from the individual at five minutes after 5:00?

"Q. Yes. A. The concentration in the blood, if he had had nothing to drink in the meantime, would have been higher at 2:30 than it was at 5:00, and *at the rate of decrease of two-tenths of a milligram per hour, it would be approximately 1.8 milligrams of alcohol per cubic centimeter of blood at 2:30, two and a half hours earlier.*"

The foregoing expert testimony, as well as the taking and result of the blood test for the alcohol concentration are quite

similar to that in Greiner v. State, 157 Tex. Cr. R. 479, 249 S.W. 2d 601.

The witness Tullis further testified, in answer to a hypothetical question based upon the state's theory of the case, that the driver of the automobile from whom the blood was taken was intoxicated at the time of the accident.

Dr. Lawrence L. Griffin, who examined and took care of appellant after he arrived at the hospital, and who took the blood specimen for analysis, was called as a witness by appellant. He testified "I thought that he had been drinking, but I did not think that he was drunk at that time." He further testified:

"I asked him where he hurt and where he was tender in going over him. I received coherent or rational answers to those questions; and I asked him something about the accident, whether or not he was unconscious or whether or not he remembered his accident, and his answers that he gave me appeared to me that he had his senses, that he was not actually drunk at that time.

"Q. Of course, you could smell alcohol, and that is the reason you knew he had been drinking? A. I could smell alcohol on his breath, yes."

And on cross-examination he testified:

"Q. Now, Dr. Griffin, if I understand you correctly, you are basing your opinion that this man was not intoxicated on the fact that he could talk coherently and rationally? A. Yes, sir.

"Q. In other words, it is your opinion that anyone who can talk coherently and rationally is not intoxicated? A. That fits in with my idea of a man being drunk."

Dr. Griffin estimated the time that he was called from his clinic as somewhere around 3 o'clock. The testimony shows, however, that Dr. Griffin took the blood specimen at 5:05 P.M. and it is not shown that he first observed appellant prior to the occasion when he took the blood and administered to him for his injuries.

Dr. Griffin's testimony is not inconsistent with the jury

finding that appellant was intoxicated at the time of the collision.

In Greiner v. State, 157 Tex. Cr. R. 479, 249 S.W. 2d 601; McKay v. State, 155 Tex. Cr. R. 416; 235 S.W. 2d 173, and Jones v. State, 159 Tex. Cr. R. 29, 261 S.W. 2d 161, we discussed rather fully the question of scientific findings and expert testimony concerning concentration of alcohol in the blood, in connection with proof of the condition of sobriety of the donor.

The effect of our holdings was that the evidence was admissible and might be utilized by the jury in reaching a verdict.

There is nothing in this record which disputes the expert testimony and we would not be warranted in holding that, together with the testimony as to appellant's drinking and the manner of his driving, this evidence is not sufficient to support the jury's finding that at the time of the accident he was intoxicated.

Viewed in the light most favorable to the state, the evidence supports the jury's verdict.

Appellant's able counsel has not questioned the sufficiency of the evidence in other particulars such as the casual connection between appellant's intoxicated condition and the death of Mrs. Ruble, in the manner alleged in the indictment, and such will not be discussed except to say that we find the evidence sufficient in these particulars as well as the particulars in which the sufficiency is challenged.

The judgment is affirmed.

DAVIDSON, Judge (dissenting).

This conviction grows out of the death of deceased which the state alleged resulted in the violation of Art. 802c, Vernon's P.C., with punishment assessed at two years in the penitentiary.

It is not a conviction for murder without malice, as my brethren state. Art. 802c, P.C., could not be a part of the law of murder, because in order to constitute murder with or without malice there must be a voluntary killing, which means an intentional killing. Under Art. 802c, P.C., the act on the part

of the accused that causes death must be done by accident or mistake. If intentionally done, there would be no violation of that statute. See Greiner v. State, 157 Tex. Cr. R. 479, 249 S.W. 2d 601.

In my opinion, the evidence in this case is insufficient to support this conviction in each and all of the following particulars: (a) The facts do not show or warrant the conclusion that appellant was under the influence of intoxicating liquor at the time; (b) if appellant was under the influence of intoxicating liquor at the time, then there is no evidence that such intoxication caused, contributed to cause, or in any manner brought about the death of the deceased; (c) there is an absence of any testimony showing that appellant drove his automobile into and collided with the automobile in which deceased was riding, as alleged and charged in the indictment; (d) the undisputed facts and physical evidence show that deceased, while operating her automobile at a high and dangerous rate of speed, drove it into and collided with the automobile occupied by appellant, which act on her part caused her death.

My brethren discuss only the sufficiency of the evidence from the standpoint of intoxication, and dismiss the remainder by saying that inasmuch as appellant's counsel has not questioned the sufficiency of the evidence in these particulars they will not be discussed further than to say that they find the evidence sufficient in such particulars.

The question of whether counsel for appellant did or did not challenge before this court the sufficiency of the evidence to support the conviction in other particulars mentioned does not relieve this court of its duty to examine the facts and to determine whether the facts are sufficient to support the conviction. Due process of law so demands, for no man should be condemned to penal servitude when the facts fail to show him guilty.

Now let us see how the state went about proving in this case that the appellant was intoxicated. It shows by appellant's confession that about an hour prior to the collision he drank some beer; as to how much or how little, there is no suggestion. Something like two and a half hours thereafter, there was taken from appellant a sample of his blood. This sample of blood was delivered on the following day to a chemist for the Department of Public Safety who made an analysis thereof to ascertain its alcoholic content. The analysis made at that time re-

vealed there was an alcoholic content of 1.3 milligrams of alcohol per cubic centimeter of blood.

It appears that some organizations have attempted to recognize certain standards for determining intoxication by blood analysis. Here, the chemist admitted knowledge of these standards and testified as follows:

"Well, the interpretation of the blood-alcohol concentration, based on the testing, and the conclusion that the 1.5 milligrams of alcohol per cubic centimeter of blood is sufficient to cause all persons to be intoxicated is recommended for interpretation by the American Medical Association and the National Safety Council."

Of necessity, the state recognized the fact that appellant's blood content did not meet that standard and, by a process of deductions, assumptions, and presumptions, set about to show that appellant's blood content was above the standard of 1.5 milligrams.

The chemist testified to the effect that it takes about one hour after a person has taken alcohol into his system for the alcoholic content of the blood to reach its peak. After that, the content decreases at the rate of "two-tenths of a milligram of alcohol for each hour the alcohol in the body is gotten rid of, partly by excretion through the kidneys, some through the perspiration and breath, and most of it is oxidized or burned inside the body* * * *."

So, by this process of deduction, the witness testified that at the time of the collision the alcoholic content of appellant's blood was 1.8 milligrams of alcohol per cubic centimeter of blood. Upon that hypothesis, the chemist expressed the opinion that at the time of the accident appellant was intoxicated—and this, without having seen him or having observed his acts and conduct or knowing anything whatsoever of his physical condition or make-up.

This is the testimony that my brethren hold sufficient to establish beyond a reasonable doubt that appellant was intoxicated at the time of the collision.

As against this testimony, I call attention to the fact that the witness Curtner, who was an eye-witness to the collision and the first one to reach the appellant thereafter, refused to testify

that appellant or any one else was intoxicated. Highway Patrolman McDaniel, arriving at the scene of the collision before appellant was carried to the hospital, saw and observed him and his injuries. This officer, to whom appellant made the confession, also made no effort to testify that he (appellant) was intoxicated at that time. To the contrary, he testified that at that time appellant's "talk was coherent." Highway Patrolman Wilson, who saw appellant at the scene of the collision and was with him at the hospital and obtained his permission to be given a blood test, made no effort to testify that appellant was intoxicated at either time or place. In fact, this witness was not interrogated about the matter.

So, those who saw appellant soon after the collision and at the hospital and were in position to observe his acts and conduct and to know whether he was intoxicated at the time failed and refused to testify that he was intoxicated.

The state's case, then, as to proof of intoxication depends solely and alone upon the inference, assumption, presumption, and deduction from claimed scientific tests by which it was shown at the time of the collision that the alcoholic content of appellant's blood was 1.8 milligrams per cubic centimeter, and the further presumption, based thereon, was indulged that the appellant was intoxicated because of that alcoholic content in his blood.

To just what kind or character of intoxication did the chemist refer when he expressed the opinion that appellant was intoxicated? Was it intoxication that is known to or recognized by chemists or scientists, or was it intoxication which the law recognizes and applies to the trial of criminal cases involving the question of intoxication? Here, the chemist did not testify as to either question.

As applicable here, intoxication was correctly defined by the trial court in his charge to the jury, as follows:

"The term 'intoxicated or under the influence of intoxicating liquor,' within the meaning of the law, and as used in this charge, means the condition of a person who is under the influence of intoxicating liquor to such an extent that he does not have the normal use of his physical and mental faculties."

There is not a line of testimony in this case that would authorize the conclusion that the appellant, at the time of the

collision, was "under the influence of intoxicating liquor to such an extent" that he did not "have the normal use of his physical and mental faculties." The chemist did not so testify. None of the witnesses who saw, observed, and talked with the appellant after the collision so testified.

My brethren hold the facts sufficient, upon the broad proposition that any one who has an alcoholic content of 1.8 milligrams per cubic centimeter of blood is intoxicated and does not have the normal use of his physical and mental faculties—and this, regardless of how sober that person is, or may appear, or how thoroughly and completely he may be in possession of all of his faculties, physical and mental.

The legislature has not seen fit to pass a statute that would say such is true or that would authorize such conclusion. Nor have we any statute saying that proof of any fact constitutes prima facie evidence of intoxication. Yet that is exactly what my brethren are here saying.

Circumstantial evidence cannot be founded upon an inference based upon an inference.

I pass now to a discussion of the other questions which are raised, assuming that the state has proven the intoxication of appellant, as alleged.

The indictment in this case charged as follows:

"* * * that Manuel Ramirez * * * did then and there unlawfully, while intoxicated and while under the influence of intoxicating liquor, drive and operate a motor vehicle, an automobile, upon a public highway of this State, to wit, U. S. Highway No. 183, and did then and there, in the execution of said unlawful act through mistake and accident kill Mrs. Jewel Reynolds Ruble by then and there driving said automobile into and causing it to collide with the automobile occupied by the said Mrs. Jewel Reynolds Ruble * * *."

The significant part of the indictment in relation to the question now under consideration is the direct allegation that appellant drove his automobile into and caused it to collide with the automobile occupied by the deceased. Such allegation was a descriptive averment of an essential element of the offense charged, and the state assumed the burden of establishing

that allegation by the proof. Without proof thereof, the state's case necessarily failed.

Now what are the facts to meet that allegation?

The collision that resulted in the death of the deceased occurred in Williamson County at the intersection of the Burnet Highway, a Federal highway, and the McNeil Road, a farm-to-market road. Deceased was driving a Dodge coupe in a northerly direction on the Burnet Highway at a rate of speed of forty to forty-five miles per hour. The east side of the highway was the right side of the highway to the deceased. She had just shortly prior thereto passed or driven around the heavy truck which was being driven by the witness Curtner, who was following a short distance behind the Dodge coupe.

A Chevrolet automobile, of which appellant was the driver, approached the intersection traveling at a rate of speed of twenty-five to thirty miles per hour in a westerly direction on the McNeil Road. There was a stop sign on the McNeil Road at the intersection. The Chevrolet automobile was driven onto the Burnet Highway without stopping or obeying such stop sign and, as it neared the center of the highway, "the Chevrolet went to make a left turn, evidently going to head back to Austin, and as the lady in the Dodge tried to by-pass them, she hit them right in broadside."

The foregoing facts are taken from and established by the testimony of the witness Curtner and are undisputed in this record.

As a result of the collision, the Chevrolet automobile was knocked approximately seventy-five feet across to the west side of the highway and across a fence into a pasture. The Dodge coupe remained upright on the east shoulder of the highway headed in a northerly direction.

There were five other persons in the Chevrolet besides the appellant, who was, himself, injured in the collision. The deceased was the sole occupant of the Dodge coupe.

A highway patrolman who arrived at the scene of the collision shortly thereafter testified that skid marks on the east side of the Burnet Highway (the side upon which the Dodge automobile was traveling) were approximately thirty-four feet and seven inches from where they started to the point of impact

and that "the skid marks did cross the center line at—right at that point." A picture was taken at the scene which shows that the skid marks extended across the center line of the highway and into the west lane thereof, which was the line in which the Chevrolet would be traveling after making a left turn on the highway "to head back to Austin."

The facts stated are undisputed and are those upon which this conviction rests.

Appellant did not testify, nor were any of the other occupants of the Chevrolet called upon to testify.

Viewing the facts as an over-all picture, it appears that the driver of the Chevrolet ran the stop sign and drove onto the highway in front of the oncoming Dodge and turned or attempted to turn to the left after entering the side of the highway that would be the right-hand side traveling toward Austin. While the Chevrolet was in this position the Dodge coupe struck it broadside and knocked it about seventy-five feet—and this, after the Dodge had skidded, with skid marks from all wheels showing, for thirty-four feet on the pavement. The witness who estimated the rate of speed at which the Dodge coupe was traveling at thirty-five to forty miles per hour was certainly not guilty of overestimating the rate of speed at which deceased was traveling.

The state calls attention to the fact that there was evidence showing that from a point of forty-nine and a half feet east of the stop sign on the McNeil Road the view was clear and unobstructed for a distance of seven hundred feet south, the direction from which the Dodge was approaching the intersection.

The state seeks to make use of this testimony to show that for a distance of forty-nine feet before the driver of the Chevrolet reached the intersection he had a clear view of the approaching Dodge coupe.

Of course if the driver of the Chevrolet could see the approaching Dodge for that distance, so also could the driver of the Dodge see the approaching Chevrolet. I am unable to recognize the significance of this testimony, for this is not a case of negligent homicide nor is negligence or the running of the stop sign an element of the offense for which appellant stands here convicted.

These facts lead to but one conclusion, and that is that deceased, driving the Dodge coupe at a high and dangerous rate of speed, pulled out of the lane in which she was traveling and into and across the center line of the highway and into the left lane and there struck the Chevrolet automobile "broadside" with such force as to knock it seventy-five feet after applying her brakes and skidding some thirty-four feet, herself.

One cannot help but conclude that had deceased remained in her proper right-hand lane and not attempted to "by-pass" (pass around) the Chevrolet, she would not have driven her car into and caused it to collide with the Chevrolet. Instead of appellant driving his automobile into that of the deceased, the deceased drove her automobile into that of the appellant.

These facts demonstrate that the state has wholly failed to establish, by the evidence, the allegation of the indictment that appellant drove his automobile into that occupied by the deceased.

Notwithstanding these undisputed facts, my brethren hold that appellant did drive his automobile into that occupied by the deceased, and they do not cite any fact or facts from this record that would justify such conclusion. They dispose of the matter with the broad statement that the facts warrant their conclusion.

I pass now to a discussion of the remaining proposition: which is that no casual connection is shown between appellant's drunken driving and the collision. For this discussion only, this question will be discussed in view of the assumption that the state proved appellant's intoxication and that he drove his automobile into that of the deceased.

My brethren so find the facts, so let us see if the state has proven appellant guilty under these facts.

Art. 802c, P.C., under which this conviction was had, as applied to the allegations here, is composed of two elements. These are (a) the intoxicated driving of the automobile on a public highway, and (b) the doing of another act by accident or mistake which act so done by accident or mistake would have constituted murder if intentionally done.

Where is the evidence which shows that appellant did, by accident or mistake, do some act that brought about the colli-

sion and resultant death of the deceased? From the standpoint of the state, every act that he did was intended. If, after he drove the stop sign and into the highway intersection and made the return into the proper lane for return to Austin, in so doing he drove his automobile into and caused it to collide with that of the deceased, such act was intended. I am at a loss to see how it can be said that appellant accidentally or mistakenly drove his automobile into that of the deceased. Yet, in affirming this conviction, my brethren so hold.

If appellant ran the stop sign and drove his automobile across the intersection and into the automobile of the deceased, as the state contends he did, then he would be guilty of murder because every act on his part was intended, either directly or impliedly. There is an entire absence of any proof that any act on the part of the appellant which brought about the collision was the result of an accident or mistake on his part.

The facts do not support the conviction.

Finally, all the authorities construing Art. 802c, P.C., and its antecedent counterpart applying Art. 42, P.C., hold that there must be a casual connection between the intoxicated driving and the act which bring about the death of the deceased.

The trial court correctly recognized the rule when he instructed the jury that they would not be authorized to convict the appellant unless, among other things, they found and believed from the evidence beyond a reasonable doubt "That the fact that he (appellant) was then and there intoxicated or under the influence of intoxicating liquor was the cause, or contributed as a cause, to said collision, and the death of Mrs. Jewel Reynolds Ruble * * *."

What act does this record show that appellant did because of his intoxication that he would not have done had he not been intoxicated? The answer must, of necessity, be "None." The running of the stop sign was no more the act of an intoxicated person than that of a sober one. Surely it cannot be said that only intoxicated persons run stop signs or that the running thereof indicates, of and within itself, intoxication. The same can be said of the act in driving into the intersection and making the turn into the proper traffic lane in traveling toward Austin. Each and every act that the appellant is accused of doing could have been the act of a sober person just as much as that of an intoxicated person.

Therefore, the facts wholly fail to establish this element of the state's case.

Of course, appellant did wrong when he ran the stop sign and drove onto the highway. Indeed, he may have been guilty of other acts of negligence under the facts. But appellant is not here upon trial for any offense or any act of negligence growing out of those acts.

The running of the stop sign, or negligence on the part of the appellant, is no part or element of the offense here charged. This is not a prosecution for negligent homicide.

In order for appellant to be guilty as here charged, he would have had to be intoxicated, which intoxication caused him to drive his automobile into and collide accidentally with the automobile driven by the deceased. The facts warrant no such conclusion.

Believing that the state has failed to establish appellant's guilt as charged, I respectfully enter my dissent to the affirmance of his conviction.

### ON MOTION FOR REHEARING

MORRISON, Presiding Judge.

The sufficiency of the evidence to establish that the appellant was intoxicated presented a serious question on original submission of this cause. The majority held that the evidence, when viewed in the light most favorable to the state, supported the jury verdict. In reaching that conclusion, we considered the testimony of the toxicologist, the effect of which was that the appellant had been intoxicated at the time of the accident. We also considered the testimony of the doctor who examined the appellant upon his arrival at the hospital, the effect of which was that the appellant was not intoxicated. The majority opinion did not discuss the fact that two members of the Texas Highway Parol talked to the appellant at the hospital prior to the taking of the specimen of blood and neither of them was called upon to give an opinion as to the appellant's state of intoxication or to testify to any act, conduct or statement on the part of the appellant that might tend to show intoxication. After further consideration, the writer has concluded that failure of the state to give the jury the benefit of the testimony of these two witnesses, both of whom testified about other mat-

ters, on this closely controverted issue must be construed against the state in our re-evaluation of the sufficiency of the evidence.

Where the testimony upon which the state relies for a conviction is obviously weak and the record affirmatively reflects that there was testimony available to the state which would have thrown additional light on the facts, and which the state did not introduce or satisfactorily account for its failure to do so, this court will treat the case as one evidencing a reasonable doubt as to the sufficiency of the evidence to support the conviction. See 18 Tex. Jur., p. 440, sec. 318; Vasquez v. State, 145 Tex. Cr. Rep. 376, 167 S.W. 2d 1030; and Buford v. State, 112 Tex. Cr. Rep. 593, 17 S.W. 2d 1072.

Under the rule stated, the writer finds the evidence insufficient to support the conviction.

The appellant's motion for rehearing is granted; the judgment of affirmance is set aside; and the judgment is now reversed and the cause remanded.

WOODLEY, Judge (dissenting on Motion for Rehearing).

Though appellant's blood analysis showed an alcohol content of 0.13 per cent, and the toxicologist testified that 90 per cent of individuals tested who had alcohol concentration of 0.12 per cent were found to be intoxicated, all of the evidence is to the effect that except for the odor of alcohol upon his breath, there was nothing to indicate that at the time appellant was seen at the hospital in Austin there was anything from which one who observed him there could conclude that he was then intoxicated.

Texas Highway Patrolman D. K. McDaniel testified that he made an investigation at the scene of the collision, and then proceeded to Brackenridge Hospital in Austin, arriving there between 4:30 and 4:35 P.M. He first talked to appellant some ten minutes later, and testified that appellant at that time agreed to the taking of a blood specimen and that some time later made the confession that was admitted in evidence.

As to appellant's condition, Patrolman McDaniel testified:

"Q. Did you talk to the defendant, Manuel Ramirez, at that time? A. Yes, sir.

"Q. And what did you do in regard to the defendant, Manuel Ramirez? A. The defendant, at the time we talked to him, was upstairs at Brackenridge Hospital outside of the X-ray room. Talked to him, asked for his driver's license, which he gave to me, and questioned or attempted to question him in regard to the accident.

"Q. What was his condition then in regard to his talk, manner of talking and so forth? A. Sir, his talk was coherent at that time. * * *

"Q. At the time you interviewed the defendant, Manuel Ramirez, did you smell any intoxicants on his breath? A. Yes, sir, I could smell alcohol.

"Q. At the time you saw him, was he walking around, standing up or lying down or sitting or what? A. Sir, he was lying on a stretcher, stretcher table.

"Q. Did he stay there during all the time you were there? A. Yes, sir."

Patrolman W. D. Wilson identified appellant as the man he interviewed at Brackenridge Hospital between 4 and 4:30 P.M. on the day in question. He testified that appellant first declined but later agreed to have a blood test made, and that he was present when the blood was withdrawn and delivered the sealed tube of blood to Mr. Tullis, the chemist. Patrolman Wilson was not cross-examined and was not asked as to appellant's condition or appearance.

It is fair to assume that, had these patrolmen who observed appellant at the hospital been asked by either counsel their opinion as to his condition of sobriety, they would not have expressed the opinion that he was then intoxicated. It is also fair to assume that the testimony of Officer Wilson would have been no more favorable to the state than that of Patrolman McDaniel or of Dr. Griffin.

But assuming that the officers had been asked and had expressed the opinion that appellant was not intoxicated when they saw him at the hospital, their testimony, like that of Dr. Griffin, would not be inconsistent with the jury's finding that at the time of the accident appellant was intoxicated. This is true because at that time, according to the expert testimony, the alcohol content of his blood was necessarily in excess of 0.15

per cent, an amount sufficiently high, according to the toxicologist, "to cause all people who have been tested to be intoxicated; and in my opinion, that concentration is sufficient to cause any person to be intoxicated."

We have held that expert testimony such as here appears was admissible on the issue of intoxication. Greiner v. State, 157 Tex. Cr. R. 479, 249 S.W. 2d 601.

There being admissible evidence to sustain the jury's verdict, their finding should not be set aside because state witnesses who did not observe appellant at the scene of the collision, but saw him for the first time at Brackenridge Hospital in Austin more than two hours later, were not asked and did not testify that he was then intoxicated.

My views are stated in the original opinion affirming the conviction and I respectfully dissent from the reversal now ordered.