188 So.2d 320 (1966)
Leroy WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
No. 6586.
District Court of Appeal of Florida. Second District.
June 24, 1966.
*321 Lester Bales, Jr., Zephyrhills, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Judge.
Leroy Williams was indicted, tried, and convicted in the Pasco County Circuit Court of murder in the first degree, with recommendation of mercy, and was thereupon sentenced to life imprisonment.
Percy A. Mong, the deceased victim, was an elderly man, about 83 years of age and, with his wife, owned and operated a country grocery store located on State Highway 35, in a small community known as Richland, about seven miles south of Dade City, in Pasco County. They lived next door to the store, and had lived and operated their business there for some seventeen years before the tragedy occurred. On the other side of the store building lived Mrs. Margaret Oliver. Sometime between 8:30 and 9 o'clock on the morning of January 8, 1965, Mrs. Oliver was doing her laundry work going back and forth from her home to her laundry house in the rear, with her washing machine in operation, when she heard two sounds like firecrackers exploding, coming from the direction of the Mong store. She paid no particular attention to the sounds but did notice immediately thereafter a green and white Chevrolet automobile, driven by a young colored man alone in the car, drive away from the direction of the store at a fast clip toward the direction of Dade City.
Mrs. Oliver went on into her home to get ready to drive to Zephyrhills for some shopping. She got her purse and keys and then went back out of the house, got in her car, started it, backed it down the driveway, where it apparently stalled. She restarted the car and, knowing Mrs. Mong was away from home, she drove next door to the grocery store to check on Mr. Mong, which was her custom before leaving thte vicinity. She stopped and parked her car outside the store, went to the front door, pushed it open and called to Mr. Mong a couple of times, receiving no response.
Sensing something might have happened, she ran on foot to a neighbor's home on the other side of the Mong residence, called to the neighbor, but getting no response there returned to the store and encountered a Mr. Windish, who lived in the neighborhood, to whom she spoke, but she was unable to make him understand what she was saying because he was hard of hearing She then again opened the front door of the *322 store, went in and called again to Mr. Mong. There was no sound after her first call but when she called to him a second time she heard a groan or moan at the rear of the store. Upon investigation she found Mr. Mong lying behind the counter with his head and shoulder on a stack of paper bags.[1] She inquired: "What happened Mr. Mong?" He said, "A man tried to rob me, I have been hurt", and then, "I need help". She immediately telephoned the police from the store, whereupon officers from the Sheriff's department came presently and took over. She estimated it was from five to eight minutes between the time she heard the original firecracker sounds and the time she had the words with Mr. Mong in the store.
The first deputy sheriff to arrive at the scene, after Mrs. Oliver called the police, found Mr. Mong behind the counter "in a sitting position, more or less" and that "there was  in Mr. Mong's right hand, there was a revolver  laying in his hand, his right hand, and his right hand was laying out on the floor." An ambulance driver, summoned to the scene and getting ready to take Mr. Mong to the hospital, was asked if he heard Mr. Mong say anything, and he replied "[o]nly on removal, he asked: `Are you taking '," when he stopped by objections from the prosecutor.
Thereafter, at about 10:30 o'clock that morning at the hospital, a neuro-surgeon examined Mr. Mong and testified that "[h]e was semi-comotose; he was not completely out, but he was very, very lethargic; he was in mild shock; his skin was cold, clammy; his blood-pressure somewhat low * * he was not completely responsive to all of his surroundings, but he was able to respond to specific questions, or specific requests of a very simple nature * * * and admitted that he was in some pain. He was able to move his arms and legs; he was able to follow my finger when I asked him to do so * * *". He had suffered two bullet wounds, one through the soft tissue on the upper arm, and the other on the right side of the head. The head wound was the more serious of the two, but x-rays of this wound showed no fractures of the skull area, was not necessarily a mortal wound, and no foreign matter was found inside either wound. Mr. Mong was conscious and was able to hear when spoken to. He was treated for shock, underwent x-rays, and given intravenous fluid although there was no appreciable amount of blood lossage. He was then put to rest in a hospital room,[2] but about three hours later suffered a heart attack, from which he subsequently expired, on the following morning, January 9, 1965, at about 11:25 o'clock A.M. The doctor stated there was a definite intervening cause between the injury and the heart failure, namely lowering of blood pressure, additional heart strain, moderate blood loss, shock, and old age.
A confession of the defendant was admitted in evidence, wherein he admitted being in the store and doing the shooting, but contended that he shot in self-defense when, during an argument over the price of pecans, Mr. Mong drew his own revolver and pointed it at the defendant, threatening him at the same time.
The foregoing constitutes a fair synopsis of the high lights of the evidence at the trial.[3]
From the judgment of conviction defendant has appealed to this Court, assigning numerous grounds of error, three of which raise serious questions: (1) admission *323 into evidence of the statement made by Mr. Mong to Mrs. Oliver; (2) admission into evidence of defendant's confession; and (3) permitting unintroduced and incriminating physical objects to be displayed in the Court room in the sight of the jury for three days, and then being "withdrawn" by the State, after the State had first tacitly assured the Court that same would be later introduced into evidence. Timely and appropriate objections were made covering such questions. We hold the trial Court in error as to each of said matters, and reverse for a new trial.
A. Res gestae. No principle of evidentary law, especially in the field of criminal cases, has suffered such a decline in prestige and respect over the years as has the "doctrine" of res gestae. Professor Wigmore, in his Vol. 6 on Evidence, 3rd Ed., § 1767, p. 182, states:
"The phrase `res gestae' has long been not only entirely useless, but even positively harmful. It is useless because every rule of Evidence to which it has ever been applied exists as a part of some well established principle and can be explained in the terms of that principle. It is harmful because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. No rule of Evidence can be created or applied by the mere muttering of a shibboleth."
After quoting the above comments of Wigmore, the opinion in State v. Kump, 76 Wyo. 273, 301 P.2d 808, text 812, derisively says: "[n]otwithstanding this statement, text books, encyclopedias, including Corpus Juris Secundum and American Jurisprudence, and cases continue to discuss what evidence is admissible under the theory of res gestae".
In Carnes v. State, 14 Okla. Cr. 585, 179 P. 475, text 478, it is said that "as to what constitutes res gestae is possibly the most complex and difficult question in criminal law." 31 Yale Law Journal, page 229, states that the term "res gestae" is used as a "substitute for reasoning." In Coryell v. Clifford F. Reid, Inc., 117 Cal. App. 534, 4 P.2d 295, text 296, the use of the term "res gestae" was criticized because its meanings "are as numerous as the various cures for rheumatism and about as useful." In Vol. 22A C.J.S. Criminal Law § 662(1) on page 661, contains the statement "that the res gestae rule is a dangerous one and should not be extended." See for a full discussion of the question, 31 Yale Law Journal, 229, 12 Washington L.R. 91; 1 University of Chicago L.R. 394; 42 Illinois I.L.R. 80; 2 Kansas Law Review 41, 121, 246. And our own Florida Supreme Court, speaking through Chief Justice Ellis, in Green v. State, 93 Fla. 1076, 113 So. 121, refers deprecatingly to res gestae as "whatever may be meant by that term, invented, so it has been said, because of its convenient ambiguity  a sort of `catch all' in which to save a point when it may not be clearly brought under some better and more clearly defined head."
The res gestae rule was originally evolved, no doubt, in good faith and for a salutary purpose; being confined to things done and statements made, in fact spontaneous, so as to be, in truth as well as in fiction, an integral part of the transaction in litigation, Garcia v. State, 159 Neb. 571, 68 N.W.2d 151; Collins v. State, 46 Neb. 37, 64 N.W. 432, or to be a necessary incident of the criminal act itself involved or to form in conjunction with it one continuous transaction, State v. Walker, 204 La. 523, 15 So.2d 874; State v. Dale, 200 La. 19, 7 So.2d 371. But the trouble is that res gestae is an exception, not a rule. The rule is hearsay, and as such is a rule of exclusion. Res gestae is an evidentiary device used to neutralize, and sometimes nullify, the beneficent hearsay rule. But exceptions, like taxes, never go in but one direction, always expanding and enlarging. It is a true philosophy that "to expound is to expand". The present low estate of res gestae can be attributed directly *324 to the fact that it has been stretched, built on, and expanded to a point never originally intended, if it ever had any efficacy in the first place. The only saving grace of res gestae is that it is impartial; its unmerited benefits are solicited by both plaintiff and defendant in civil cases, and by both the State and the defendant in criminal cases.
But it is not for this Court to pronounce or proclaim the abolition of the res gestae rule, nor do we have to in this case. It is to the credit of the Florida Courts that the rule in this State has been held within respectable bounds, and the reported cases, although small in number, render inadmissible the testimony in question.
In Green v. State, supra, the fourth headnote is as follows:
"If a person who was a party or a witness to a transaction makes at, or shortly after the incident, a statement in the form of a narrative of a past event, although relating to the transaction, such statement is not considered a part of the res gestae and (is not) admissible as evidence." (Emphasis supplied.)
Emphasizing the foregoing headnote, the opinion in Green narrows the scope of res gestae in the following language in the body of the opinion (text 113 So. 123):
"Whatever it is or is not there is at least one certainty in relation to it, and that is, if the supposed statement, exclamation, or spontaneous utterance takes the form of a narrative of a past event, it is very well established that it may not be considered as part of the transaction or res gestae." (Emphasis supplied.)
In Lambright v. State, 34 Fla. 564, 16 So. 582, the eleventh and twelfth headnotes, in reverse order and inter alia, state:
"All declarations or exclamations uttered by the parties to a transaction, and which are contemporaneous with and accompany it, and are calculated to throw light upon the motives and intention of the parties to it, are clearly admissible as parts of the res gestae.
"It is not competent for a party who has received a mortal wound to state who inflicted the wound, unless the statement formed a part of the res gestae, or is admissible as a dying declaration." (Emphasis supplied.)
Vickery v. State, 50 Fla. 144, 38 So. 907, was a case strikingly similar in factual structure to the instant case. We quote from Justice Whitfield's opinion in Vickery (text 38 So. 908):
"The defense introduced three different witnesses, and asked each one of them to testify whether or not, within the next four, five, or ten minutes after the shooting, the deceased stated to the witness who shot him, and whether the man who shot him had two legs, and whether or not the defendant shot him. The state attorney objected to the questions as seeking hearsay testimony. The objection was sustained, and the defendant excepted. The transcript does not disclose what transpired between the shooting and the time to which the questions relate, so as to show that the supervening circumstances, including the statements inquired about, were all the product of, and a part of, the difficulty itself. In the absence of such showing, the questions objected to cannot be held to relate to declarations which were produced by the occurrences to which they relate, but, rather, that they relate to a retrospective narration of them, and they were therefore properly excluded."
When measured by the holdings in the foregoing cases, we are convinced that the testimony here under consideration should not have been admitted. The critical evidence consisted of a statement made by the victim, Mr. Mong, to the witness, Mrs. Oliver, the only other person present, in words as nearly as she could recall: "A *325 man tried to rob me, I have been hurt; I need help". These words were uttered after Mrs. Oliver had entered the front door of the grocery store and, hearing a groan to the rear of the store, had hurried to him, inquiring excitedly: "What happened, Mr. Mong?" Introduction of Mr. Mong's words were objected to on the ground of hearsay, but the State countered that the statement was admissible "as part of the res gestae" and over objection of the defendant it was received in evidence and allowed to go to the jury.
It seems clear that Mr. Mong's statement constituted a narration, pure and simple, of events that had happened. The State contends that his statement was not really in reply or in response to her question, but such is quibbling. We think from a careful reading of the record that it was in direct answer to her inquiry; but it is actually immaterial whether it was or not. Even if the question had never been asked, the statement standing alone could only have been characterized as a narrating of something that had previously happened. His statement was no part of any robbery itself; nor was it any integral part of a felonious assault. It was not a part of "the main transaction involved", which was the unlawful killing of Mr. Mong, nor was it spontaneous to the main event. It was made at a time some five to eight minutes after the shooting. He had not been mortally wounded. He died in the hospital some twenty-six hours later from a heart attack, suffered several hours after the shooting. The first officer to arrive on the scene found him "in a sitting position more or less" with a revolver in his right hand. A careful study of the record before this Court, including the words used by Mr. Mong and the setting in which they were spoken, impels the conclusion that the statement was one of rational deliberateness, intended to impart to Mrs. Oliver a brief knowledge of what had happened so that she could act accordingly in his behalf. Being so, the evidence fell within the ban of hearsay testimony, and cannot be rescued by res gestae.
And it cannot be said that its admission was harmless error. Aside from its strong incriminating character as tending to establish a heinous law violation generally, there was yet an additional element which made such evidence highly damaging to the defendant, viz: it constituted the only evidence in the record that would qualify the killing as being first degree murder as distinguished from lesser degrees of homicide. F.S. Section 782.04 F.S.A. makes it murder in the first degree to kill a person with premeditation, or in the perpetration of a robbery (among other serious crimes). There was no evidence in this case whatever of premeditation, and the reference to a robbery by Mr. Mong in his statement to Mrs. Oliver was the only item of evidence which would raise the offense to first degree murder. So that the words uttered by Mr. Mong take on added significance. It places the defendant right in the shadow of the death chair. The impact upon the jury was borne out by the verdict itself.
The observation of that distinguished linguist and jurist, Justice Cordozo, in the celebrated case of Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 25, 78 L.Ed. 196, in dealing with the admission of hearsay declarations to prove a fact in a murder case, is pertinent here:
"It (the Government) used the declarations as proof of an act committed by some one else, as evidence that she was dying of poison given by her husband. This fact, if fact it was, the government was free to prove, but not by hearsay declarations. * * * The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not *326 in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. Thayer, Preliminary Treatise on the Law of Evidence, 266, 516; Wigmore, Evidence, §§ 1421, 1422, 1714. These precepts of caution are a guide to judgment here."
B. The Confession. On January 28, 1965, deputy sheriffs Vogt and Blewfield, knowing that the defendant Leroy Williams had been in jail for three weeks charged with the instant murder, that he had already been indicted for first degree murder, and that he had a lawyer and who his lawyer was, took the defendant out of his jail cell and transported him to a small room, possibly 10' x 10' upstairs on the second floor of the jail building, in which room there was only a desk and three chairs. They went inside, closed the door, sat down and Officer Vogt describes what happened in the following language:
"At the time I talked to the Defendant, I displayed a weapon to the Defendant that was in the plastic bag, and I advised him  or asked him to look at what I had found, and I asked him if he wanted to talk to me. He said he did not want to talk to me, that he had an attorney, and had been advised not to talk to me. * * I said: Very well  or we did, both of us (Officers Blewfield and Vogt) and we started to get up and leave the room, and the Defendant sat there. So, I walked back toward the room and I stood there, and the Defendant kept sitting. I started out again and I said  he said, the Defendant said: I am guilty of this thing; I did shoot the man. He said there was an argument over pecans; I asked him why they were 50 cents a pound and he told me to get out of the store; I said: What did you say, and he said: I will shoot you, and the man was leaning on the end of the counter; he reached under the counter and I walked around the end of the counter and saw a gun; at that time, I grabbed his left arm and told  I grabbed his left arm and took my gun out and told him to drop the gun; I thought he was going to shoot me, and so, I shot him; I don't know how many times I fired."[4]
The officers did permit the defendant to call his lawyer immediately after procuring the statement from him. Their professed reason for taking the statement was that "there was two sides to every story" and they just wanted "to hear his side of the story"; just wanted "to get a clear picture of what took place, to present the facts" to the jury.
Chief Judge Allen of this Court, in the case of Sciortino v. State, Fla.App. 1959, 115 So.2d 93, text 95, had this to say with respect to the strictness attendant upon admissions of confessions in evidence in criminal cases:
"It has been contended that confessions of a person accused of a crime are evidence of the highest character, on the theory that no person will acknowledge that he has committed a grave crime unless he is actually guilty, and that a person will not make an untrue statement *327 against his own interest. However, the courts have repudiated this theory, recognizing that persons have confessed to crimes which they did not commit, in the hope of averting punishment. Consequently, it is now the great weight of authority that confessions of parties charged with crime should be acted on by courts and juries with great caution, especially where the party is under arrest when the confession is made. Indeed, an extrajudicial confession of guilt, standing alone, will not authorize a conviction on a criminal charge, even though believed by the jury. 13 Fla.Jur., Evidence, § 423."
In order for a confession to be admissible to go before the jury, it must have been freely and voluntarily made, and not influenced directly or indirectly by any threat, promise, fear, hope, coercion, extortion, or other illegal inducement. Other anesthetizing influences which might under certain circumstances condemn a confession, in what has been characterized as a "totality of circumstances", are: systematic, persistent, prolonged interrogation; unlawful detention; failure to inform the accused of his right to decline to make a statement, and other organic rights; mental incapacity; degenerate character; ignorance and age, either youth or senility. Dawson v. State, Fla. 1962, 139 So.2d 408, text 416. This is not to say that any one or even a plurality of the foregoing elements automatically ipso facto rule out a confession, but might do so in any case where the "free will offering" was unduly induced thereby.
Having reviewed some of the elements going to the admissibility, as distinguished from the credibility, of a confession we turn now to the duty of the trial Court in the premises. It is the responsibility of the trial Judge to determine in the first instance whether a confession was truly voluntary, and this is a matter of law. He is vested with discretion, which must be exercised with great care, in determining whether or not the confession was in fact freely and voluntarily given, and was bereft of the other debilitating elements aforesaid. Cochran v. State, Fla.App. 1960, 117 So.2d 544, 79 A.L.R.2d 638; Graham v. State, Fla. 1956, 91 So.2d 662; Kersey v. State, 1917, 73 Fla. 832, 74 So. 983.
Such inquiry as to admissibility must be conducted in the absence of the jury, and in determining whether the confession was voluntary, the Judge must hear all evidence offered by the State and the defendant relative to the manner in which the confession was obtained. Graham v. State, supra.
In Florida,[5] the prosecution has the burden of proving that a confession sought to be admitted has been freely and voluntarily given. Reddish v. State, Fla. 1964, 167 So.2d 858. In Reddish, after the original opinion of the Supreme Court had reversed the first degree murder conviction largely upon the error in admission of a confession, the State sought to have the Court modify its rule, as stated in the opinion, that the burden of proof is initially upon the State, but the Court remained firm on the point, in the following language (text 167 So.2d 864):
"Florida has long adhered to the rule that preliminary to the introduction of an extrajudicial confession it is the state's burden to go forward with the evidence to establish its admissibility. This includes the burden to make a prima facie showing that the confession was voluntarily given. When the *328 state has accomplished this, an accused who denies the voluntariness of the confession must then go forward with evidence to support his position. The trial judge then rules on the basis of all of the evidence. (Then follows a long list of Florida cases uniformly holding accordingly)".
The preliminary non-jury session of Court, for the purpose of enabling the State to carry its burden of establishing the admissibility of the confession, is known as "laying the predicate", followed by a "proffer" on the part of the State after the burden has been assertedly carried. In the instant case, the rites were duly observed, the jury was excluded from the Court room, the two deputy sheriffs who procured the confession were called in and were examined at length by both counsel and also by the Court, whereupon the "proffer" was made and the Court held the same admissible.[6]
But an amazing, almost unbelievable, thing had happened. 51 pages of the record filed here were consumed in "laying the predicate". But whatever was laid, it wasn't the predicate. An almost microscopically close examination of the record discloses that not a single question was asked nor answer given as to whether the alleged confession was legally admissible, i.e., whether it was in fact freely or voluntarily made, whether any threats or coercion were used against the defendant, whether he was promised anything, whether he was extended any hope in the future, whether he was put in fear, or whether any of the other improper influences or inducements, hereinbefore partially enumerated, were used, either actually, impliedly, or psychologically. Apparently, in the seeming anxiety to hear what the officers would testify the defendant said at the alleged confessional interview as to the happenings at the Mongstore, all parties apparently lost sight of the real purpose of the preliminary hearing, which was exclusively to determine, not what the defendant had said concerning the shooting, but to "air out" all the facts and circumstances surrounding the giving of such statement. This would include statements made by the parties, the acts and doings of the participants, the conditions and general atmosphere prevailing at the time and place the confession was made, the physical and mental condition of the defendant, and the many other innumerable factors that would logically go into the matter of determining the admissibility of the statement.
A case very much in point is Louette v. State, 152 Fla. 495, 12 So.2d 168, and we quote pertinent parts of the opinion:
"The question arises whether the trial judge erred in admitting the testimony of officer Fisher as to incriminating admissions made by the defendants without first, in the absence of the jury, inquiring into the circumstances under which the admissions were made and determining whether or not they were freely and voluntarily made; that is, whether they were obtained by any threats, inducements, promises or other improper influences. It is true that the testimony of the officer did not disclose any improper methods had been resorted to to get these defendants to make the incriminating admissions testified to by the officer, nor does it appear that such improper influences were not brought to bear.

* * * * * *
"Our conclusion therefore is that in this case the court erred in admitting the testimony of officer Fisher as to the highly incriminating admissions made by the defendants, while under arrest and in custody, without first inquiring into the circumstances under which they were made and determining the question as to whether or not they were freely and voluntarily made, uninfluenced by the *329 use of any force, intimidation, coercion or threats, or the holding out of any inducements to them." (Emphasis supplied.)
It goes without saying that in the instant case the State failed to carry its burden, which was a prerequisite to admissibility. It may be said that defendant's counsel could have brought out the variable factors pertinent to the admissibility of the statement, either by detailed cross-examination of the officers or by putting the defendant on the stand, but he was certainly under no legal duty to do so. There is no responsibility on the part of one party to a law suit to do what the law imposes upon the other side.[7] But in justice to defense counsel in the instant case, he did in fact make several approaches in that direction, either by design or by accident, when he asked each of the officers on several different occasions what other statements were made or things done by any of the three persons present. But his every question in this regard was met by the same sing-song, almost mechanical, responses, "can't remember", "can't recall", "can't recollect", "just general conversation", etc. Aside from the fact that such questions did not come close to affirmatively establishing admissibility, the vague, indefinite answers so given were not sufficient as proof of anything. An affirmative fact cannot be proven by negative testimony nor by meaningless know-nothing responses. It is idle to speculate on why the State did not make some attempt to establish, at least prima facie, the admissibility of the confession. Suffice to say it did not; suffice to say it rendered the confession inadmissible; suffice to say it infected the judgment of conviction with the seeds of reversal when it was admitted and allowed to go to the jury.
But the confession must go out for a more ominous reason. In Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, the U.S. Supreme Court in May, 1964, held that 
"[u]nder the Federal Constitution, any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime" (Emphasis supplied),
and that any confession procured from a defendant under such circumstances is violative of the Fifth[8] and Sixth[9] Amendments to the Constitution and is inadmissible in evidence, regardless of voluntariness. In Massiah the defendant was not in jail, he was not in custody of the law, but was free on bail. The incriminating statements were made, not to any law enforcement officer, but to a codefendant Colson, likewise at liberty on bail, with whom the defendant was carrying on a conversation sitting in Colson's automobile parked on the street. By prearrangement with Colson, a federal agent some distance away listened to the entire conversation by means of radio communication. Later, the incriminating statements made by the defendant during the conversation were admitted in evidence over objection at defendant's trial, the defendant was convicted, his conviction was affirmed by the Court of Appeals, and the Supreme Court then reversed.
The opinion in Massiah observed that in Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, the Supreme Court had reversed a State criminal conviction because a confession had been improperly admitted in *330 evidence, but that, while the reversal had been grounded primarily upon a finding of involuntariness, four of the Justices had strongly favored reversal of the conviction "upon the sole and specific ground that the confession had been deliberately elicited by the police after the defendant had been indicted, and therefore at a time when he was clearly entitled to a lawyer's help". The Court in Massiah further pointed out that Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527, had previously held that the early stages of a prosecution prior to actual trial were "perhaps the most critical period of the proceedings * * * when consultation, thorough-going investigation and preparation [were] vitally important" and that a defendant was "as much entitled to such aid [of counsel] during that period as at the trial itself". Massiah stated that such "basic constitutional principle" had been broadly foreshadowed by the opinions in Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193, and Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; as well as in the Spano and Powell cases.
The cases cited in Massiah are significant as reflecting the positive thinking of that Court on the right of a defendant to counsel at all "critical" stages of the prosecution. In Gideon v. Wainwright the right of counsel at his trial was vouchsafed to the defendant. In Hamilton v. State of Alabama it was held that he had the right to counsel at his arraignment. In White v. State of Maryland it was held he had the right to counsel at his arraignment or "preliminary hearing". And in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, it was held he had the right to counsel "[w]here the [police] investigation [conducted prior to indictment,] is no longer a general inquiry into an unsolved crime but has begun to focus upon a particular suspect" in police custody. Escobedo and Massiah held confessions or incriminating statements made at the "critical periods" there involved inadmissible at a subsequent trial.
While the Massiah case involved a federal Court conviction and the Court's opinion derived from the Fifth and Sixth Amendments, the conclusion is inescapable that the same result would have been arrived at, through utilization of the Fourteenth Amendment, if the criminal conviction had been in a state Court. The five cases specifically cited in the Massiah opinion, Hamilton, White, Gideon, Powell and Spano, all involved state Court convictions in Alabama, Maryland, Florida and New York. Still other cases from the high Court contemporaneous with Massiah lend further conclusive proof that state Court convictions are necessarily embraced in the broad sweep of Massiah's pronouncement. See Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653; Murphy v. Waterfront Commission of New York, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, and Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205, all decided by the U.S. Supreme Court a few weeks after Massiah.
Malloy was a case from the state Courts of New York involving the privilege against self-incrimination under state statutes, and the Court held as follows:
"We hold that the Fourteenth Amendment guaranteed the petitioner the protection of the Fifth Amendment's privilege against self-incrimination,
* * * * * *
"We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgement by the States.
* * * * * *
"The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement  the right of a person to remain silent unless he *331 chooses to speak in the unfettered exercise of his own will, and to suffer no penalty, as held in Twining, [Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97] for such silence."
* * * * * *
Murphy was a case from the state Courts of New Jersey involving the grant of immunity under state statutes and the Court summarized the rationale of its lengthy opinion in the fifth headnote as follows:
"The availability of the Federal privilege against self-incrimination to a witness in a State inquiry is to be determined according to the same standard that is applicable in a Federal proceeding."
Jackson was a case from the state Courts of New York, and the Court held unconstitutional, as violative of the due process clause of the Fourteenth Amendment, New York statutory procedure for determining admissions of confessions in criminal trials in the New York Courts.
The impact of Massiah has been felt by various state Courts of last resort which without exception have recognized and followed its holding in state criminal prosecutions.
The New York state Courts had already been applying the rule of Massiah since the concurring opinion in Spano, and the New York cases are listed in Massiah. We quote from the holdings of Courts of other States and territories since Massiah:
In State v. Taylor, 270 Minn. 333, 133 N.W.2d 828, the Supreme Court of Minnesota (1965):
"A confession obtained from a defendant who has been denied counsel directly (citing Escobedo, supra) or indirectly (citing Massiah, supra) cannot be admitted over objection." (Emphasis supplied.)
In State v. Longmore, 178 Neb. 509, 134 N.W.2d 66, the Supreme Court of Nebraska (1965):
"The use of any confession obtained in violation of the due process clause requires reversal of the conviction even though unchallenged evidence adequate to convict remains (citing and quoting from Spano, Gideon and Massiah, supra) * *. A defendant formally indicted and charged with a homicide is entitled to the right of effective counsel at every step of the proceeding. While it is important that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence." (Emphasis supplied.)
In Commonwealth v. McCarthy, 348 Mass. 7, 200 N.E.2d 264, the Supreme Judicial Court of Massachusetts (1964):
"In the Massiah case the defendant did not know that his remarks to a confederate who was cooperating with the authorities were being overheard. But we do not understand the holding to turn on that point. The court in general terms stated a rule against interrogation after indictment in the absence of counsel. This is now a constitutional principle applicable to these cases." (Emphasis supplied.)
In King v. State, 212 A.2d 722, the Supreme Court of Delaware (1965):
"We do not think that the United States Supreme Court has held that the constitutional right to counsel attaches prior to arrest. The guarantee has been gradually extended by that Court in the trilogy of recent cases  but not that far in our view: In Gideon (citation), it was held that the right to counsel is guaranteed at trial; in Massiah (citation) it was held that the right of counsel is guaranteed between trial and indictment; and in Escobedo, it was held that the right to counsel is guaranteed between indictment and arrest." (Emphasis supplied.)
In People v. Dorado, 62 Cal.2d 338, 42 Cal. Rptr. 169, 398 P.2d 361, the Supreme Court of California (1965), after a lengthy detailed discussion of Escobedo and Massiah:
"Since we must faithfully discharge our duty to apply to the instant case the Constitution *332 of the United States as interpreted by the Supreme Court of the United States, we must follow these recent decisions" (citing Massiah and Escobedo). (Emphasis supplied.)
In Duncan v. State, 278 Ala. 145, 176 So.2d 840, the Supreme Court of Alabama (1965):
"Massiah is, of course, a case which originated in the federal court, but it no doubt applies to state courts since the right to counsel guaranteed in the federal system by the Sixth Amendment has been held to be binding upon the states by virtue of the due process guarantee of the Fourteenth Amendment" (citing Gideon, etc.). (Emphasis supplied.)
In Galarza Cruz v. Delgado, Warden, (1964) 233 F. Supp. 944, the District Court of Puerto Rico:
"An accused was entitled to assistance of counsel after he had been arrested and expressly charged with attempted murder, and therefore any incriminating statement or confession contained in a statement obtained from prisoner during such period of incarceration without access to counsel was inadmissible regardless of the fact that prisoner had not requested counsel, and admission of the statements in evidence leaving to jury determination of voluntariness of the confession deprived prisoner of due process."
See also People v. Stewart (1965), 62 Cal.2d 571, 43 Cal. Rptr. 201, 400 P.2d 97; Roach v. State (1965), 111 Ga. App. 114, 140 S.E.2d 919; Commonwealth v. Ewing (Pennsylvania 1965), 6 Adams L.J. 114; State v. Gallagher (1964), 97 Ariz. 1, 396 P.2d 241; State v. Kitashiro (Hawaii 1964), 397 P.2d 558; State v. Neely (1965), 239 Or. 487, 395 P.2d 557, 398 P.2d 482, and State v. Turnbough (Missouri 1965), 388 S.W.2d 781, where the State Courts of California, Georgia, Pennsylvania, Arizona, Hawaii, Oregon and Missouri respectively have recognized the applicability of Massiah to cases within their own local jurisdiction, thereby acknowledging the paramount authority of the U.S. Supreme Court in this constitutional area.
There is no good reason why this 2nd District Court of Appeal of Florida should not likewise follow the now-controlling doctrine of Massiah. There can be no timidity in the field of fundamental organic rights nor hesitance in observing stare decisis (no matter how much it may have been honored in the breach rather that the observance in other jurisdictions). Virile courts must keep abreast of the passing times, and the passing times are not always what we would want or what we would desire or what we would ordain. But every judicial officer in this State has taken a solemn oath to uphold the Constitution of the United States as well as the State of Florida; and after all, as a high Court Justice once said, "the Constitution is what the judges say it is". That Court and those judges have spoken. We in Florida are faced with a condition, not a theory. We hear a lot about mandates from the seat of National Government, but if we would just simply heed the irresistible portents in time we could avoid most of those self-same mandates later on.
In the words of the Supreme Court of Alabama in Duncan v. State, supra:
"In the area of interpretation of the United States Constitution we are obliged to accept the majority view of the Supreme Court of the United States, however we may individually assess the dissents of Justices Black, Clark and Harlan, in which latter Justice Stewart joined. We say here, as the late Justice Stone said in Green v. State, 73 Ala. 26, 31:
`* * * We have uniformly, on Federal questions  those in the solution of which the Federal Supreme Court exercises a supervision of our judgments  conformed our rulings to the law as declared by that tribunal. This we have done, because, on all questions arising under the Constitution of the United States, and the acts of *333 Congress thereunder, the rulings of that court are final, to which all State tribunals must yield. Nelson v. McCrary, 60 Ala. 301; Pollard v. State, [ex rel. Zuber,] 65 Ala. 628; Maguire v. [Board of Revenue of] Road Commissioners, 71 Ala. 401. We will not depart from these rulings, however much we may sometimes differ from the reasoning and conclusions of the majority of that court. * * *'"
In the case sub judice both factual prerequisites laid down in Massiah were present  the defendant had already been indicted by the grand jury, and he already had Court-appointed counsel  and officers Blewfield and Vogt were in full knowledge of both facts. They did what was condemned by Massiah. True, the defendant did not in terms demand that his lawyer be present; neither did Massiah. The "constitutional right to counsel does not arise from a request for counsel, but from the advent of the accusatory stage of the proceedings against the defendant". People v. Lilliock, (1965), 62 Cal.2d 618, 43 Cal. Rptr. 699, 401 P.2d 4. Let us say here: the defendant in this case may be guilty, he may have committed a most revolting crime, he may have been friendless, he may have had counsel appointed for him because of his indigence, yet he is, under our concept of Constitutional guaranties, entitled to a trial in accordance with established law, that and no less.
The alleged confession should not have been admitted, not only because of the trial procedure hereinbefore discussed, but also upon the paramount authority of Massiah as it applies to the facts here and as it has been construed in other State jurisdictions similar to ours.
c. The Silent, Unintroduced Physical Evidence. At the beginning of the trial, the State placed directly in front of the jury in the Court room certain physical objects, nine in all: a wheel and tire combined, a composite exhibit consisting of three exploded gunshell casings, three plaster casts, and four photographs. From the testimony later at the trial, the plaster casts were taken from tire tread marks in front of the Mong grocery store on the morning of January 8, 1965. The four photographs were pictures taken of the same tire marks. The composite exhibit consisted of three spent shells found on the inside of the store. All nine exhibits were produced at the trial by Officer Vogt, he having taken the photographs and made the plaster cast moldings himself at the Mong store. As to the wheel and tire, he and deputy Blewfield had supervised their dismantling from a 1956 Chevrolet bearing Florida 1964 license tag #4-54436, parked in front of the police station in Dade City on January 8, 1965, the date of the shooting and the arrest of defendant.
Soon after the trial started, while respective counsel were having a bench conference, the defendant's attorney first raised the matter of the objects being openly before the jury, and the following colloquy occurred:
"MR. BALES: * * * while I am up here, the State rolled in a wheel here in front of the Jury, and laying plaster casts on this desk over here, and I would like to have something done here to get some of these exhibits out of the view of the Jury; they are sitting there staring at them all the time.
"MR. McCLAIN: These matters are subject to being connected up. (Emphasis supplied).
"THE COURT: I think that is true, but here is what the thing is: A lot of times if you don't connect it up, something like a gun, and a bullet, and so forth, if you don't connect them up, then prejudice might accrue by the mere display to the jury; so keep that in mind." (Emphasis supplied.)
However, all nine exhibits remained unmoved all during the first day of the trial. On the second day they were there as before, and defendant's counsel, at another *334 bench conference, raised the matter again, as follows:
"MR. BALES: I have the same matter again as I brought yesterday to the Court's attention, that these exhibits are still laying on the table, that have been tendered into evidence; the wheel is still laying up against the desk over here, and  (interrupted)
"MR. McCLAIN: I have no objection to the wheel being moved.
"MR. BALES: I don't want it moved now, but the next time we have a recess. I am going to make sure  (interrupted)
"THE COURT: I will tend to that right now." (Emphasis supplied.)
Nothing was done, however, and they remained there during that entire day. On the morning of the third day of trial the State Attorney announced that he was going to "withdraw" the nine exhibits, whereupon defendant's counsel moved for a mistrial, which was denied by the Court.
The State had gone to elaborate pains in its testimony from numerous witnesses to build up the foundation for the introduction into evidence of the nine exhibits; as to how the photographs were taken, how the plaster casts were made, where and under what circumstances the empty gun cases had been found and where and under what circumstances the wheel and tire were procured. All of this was ostensibly to connect the defendant with the scene of the shooting at Mong's grocery store through the defendant's green and white Chevrolet car.
The foregoing presents a situation which, if deliberate was extremely reprehensible, and if unintentional was a flagrant disregard of defendant's rights and the rudimentary ground rules of fair play in a jury trial. All the rules of evidence built up over the centuries are aimed at insuring that the jury sees and hears only such evidence as is legally admissible. We could elaborate further on this point, but inasmuch as the case has to be reversed anyway, we pretermit further discussion. In any further trial of this case we are confident the same situation will not again occur.
For the errors hereinbefore pointed out, the judgment of conviction appealed from is reversed and the cause remanded for a new trial.
Reversed and remanded.
LILES, Acting C.J., and FLYNN, ROGER D., Associate Judge, concur.
NOTES
[1] We have traced somewhat in detail the movements of Mrs. Oliver to throw light on the time element involved in the subsequent admission of Mr. Mong's statement.
[2] This delineation is to throw light on Mong's rationality at and for a reasonable time after the assault.
[3] The actual trial proceedings comprise 501 pages of the record here.
[4] Both officers testified upon direct examination and also cross-examination, and of necessity gave their stories several times as to what happened in the room. An interesting side light is that on each occasion when officer Vogt gave his narration it was in substantially identical language, word for word, and officer Blewfield's was slightly less so. Yet when they were asked repeatedly upon cross-examination as to anything else said or done in the room their minds were complete blanks, they could neither remember, recall, nor recollect. But their remembered version of what the defendant said was scintillating and letter-perfect. Of course, there is very little the Courts, especially the appellate Courts, can do about this as the weight and evaluation is strictly for the jury. But it does point up the extreme care and thoroughness which should attend the trial Court's preliminary investigation into all the facts and circumstances surrounding the giving of such a statement to make sure that the interrogation was not infected with any of the vices condemned by the cases, before permitting the jury to hear it.
[5] Apparently, in the Federal Courts, at least in this jurisdiction, the rule is different; the burden is not on the government in the first instance to show the voluntary character. Rhodes v. United States, CA 5 1955, (Fla.), 224 F.2d 348, but cf. Schaffer v. United States, CA 5 1955, (Fla.), 221 F.2d 17, 54 A.L.R. 2d 820.
[6] See ante, page 322.
[7] See Louette v. State, supra.
[8] "No person * * * shall be compelled in any criminal case to be a witness against himself * * *".
[9] In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defence".