PIERCE, Judge.
The State of Florida brings to this Court an interlocutory appeal from an order entered by the Hillsborough County Circuit Court suppressing the confession of appellee Rufus Rollo Alford, defendant therein, after a pre-trial evidentiary hearing, in a case herein^ Alford was being held for first degree murder.
The sole question before this Court is the sufficiency of the evidence, under the applicable law, to support the order appealed. The witnesses at the hearing were: Lt. Beauford Cooper of the local Sheriff’s Office; detective Oscar Alfonso of the Tampa Police Department; Captain Walter C. Heinrich of the Police Department; Ted N. Williams, a private polygraph operator; and C. Ray McDaniel, one of Alford’s attorneys.
From these witnesses the following factual posture was established:
On March 13, 1968, before noon, detective Alfonso, accompanied by deputy sheriff Whitt, went to Alford’s place of employment at Cone Brothers Contracting Co., on East Sligh Avenue in Tampa, where they placed Alford in custody and took him to the County Jail. Alfonso at that time had in his pocket a warrant charging Alford with “enticing minors” which was never served nor followed up. At the jail Alford was questioned intermittently from noon until about 6:30 P.M., and on that evening was finally “booked” on charges of “straight vagrancy”, which the officers conceded was a subterfuge or a “holding device” to hold him for further questioning without bail. Beginning about “5:00 o’clock or after” that afternoon Alford was questioned rather intensively by Lt. Cooper and deputy Whitt of the Sheriff’s office and Captain Heinrich and detective Alfonso of the City Police about the January 23, 1968 murder of one Kathleen Martin. This lasted well over an hour — “the interrogation and everything was concluded by about 6:30”.
The following morning at about 11:30 A.M. Alford was taken by Sheriff’s deputies to the office of a local private polygraph examiner, one Ted Williams, for purpose of taking a “lie detector test”. After waiting there for about an hour, Williams took Alford into a “back office” to administer the test, closing the door, leaving the officers in the “front office”. The test was “run” and a confession obtained while Williams was alone in the back office with Alford.
During the time when this back office operation was going on, Lt. Cooper in the front office received a call from one of Alford’s attorneys, Ray McDaniel, “concerning Mr. Alford”. Attorney McDaniel was in Lt. Cooper’s office at the jail and, to use Lt. Cooper’s language, “he told me he represented Mr. Alford and he wanted to see his client”. Lt. Cooper did not disclose his own whereabouts or Alford’s whereabouts but “I told him I was away *584 from the office;, but I would return his client to him, but I didn’t say when or how long it would be”.
Thereafter, while Alford was still in the back room with Williams, Lt. Cooper went out “to the Colonade * * * to get a sandwich”, and while there was summoned back to Williams’ office, being advised that “Mr. Alford had confessed to the charges that were made against him”. After Lt. Cooper returned to Williams’ office and the confession was drawn up and signed by Alford and in fact after they were all in the automobile outside the building, getting ready to return to the County Jail, the officers produced a written form used by the Sheriff’s office, designated as a “consent to interview”, and had it executed by Alford. This was a standard form utilized by the Sheriff’s department consenting to the lie detector test and was primarily for the protection of operator Williams from liability. As indicated, this form was signed by Alford some time after the test was concluded, after the confession was signed, and after they had departed the building.
Alford’s sister, a Mrs. Emerson, lived in Bartow and on that morning of March 14th she had contacted attorney McDaniel (who lived in Lake Alfred) and at her instance he had come to the Sheriff’s office in Tampa to try to contact and if possible confer with Alford. He proceeded immediately to the County Jail and talked to a Sergeant at the “booking desk”. He asked to see Alford and the Sergeant went to a back room, but later came back and told McDaniel he could not see Alford, “that two deputies had him out”. McDaniel was directed to go to Lt. Cooper’s office upstairs, which he did. He saw deputy Whitt, identified himself as Alford’s attorney, and stated he wanted to see his client Alford. After some delay Lt. Cooper called in and the lawyer told him over telephone, “I want to see my client, now”, and Cooper replied “Well, come on out here”. Later in the same conversation Cooper said “No, never mind. We will be there in just a minute * * * About five minutes”. The lawyer said “All right. I don’t want him interrogated any more. I will wait here in jail”, to which Cooper replied, “You will see him in jail”. McDaniel was informed by Whitt at that time that Alford was “under investigation now. No charge”.
It was about 11:10 A.M. when McDaniel and Cooper had their telephone conversation. Cooper had promised to have Alford at the jail in about five minutes. McDaniel waited at the jail for about an hour and forty-five minutes after that, during which time the two deputies left the office. McDaniel then tried to recontact Lt. Cooper through the lady secretary in his office, but she could not locate him.
McDaniel then proceeded immediately to the Court House chambers of Circuit Judge Bruton where he “told him my problem”. After several telephone calls the Judge turned and told McDaniel, “Go back to the jail and your client will be waiting for you. If he is not, come back to me.” McDaniel then went back immediately to the jail, arriving at approximately 2:30 P.M. At 2:48 P.M. Lt. Cooper arranged for McDaniel to have his first interview with Alford in the jail interrogation room.
Alford’s appearance was not too inviting. According to McDaniel, Alford had “two days growth of beard on him. He was dirty, body odor was very bad. He obviously was crying. He was crying at that time, in talking to me. His eyes were red. His face was flushed. He was grimy, dirty, like I say, he was unshaven. * * * He was shaking all over — almost the very first thing he said to me was that he had just signed a confession about twenty minutes before. I asked him why — if I may repeat the words that I used, I said, ‘why did you sign the damn confession ?’ He said, ‘Well, son, you would have, too.’ ”
On April 2, 1968, Alford was indicted for the first degree murder of Kathleen Martin. On July 19, 1968, Alford’s attorneys filed motion to suppress the confession obtained on March 14th aforesaid. After hearing extensive testimony, order was entered by *585 Circuit Judge Maxwell on July 22, 1968, granting the motion and suppressing the confession. On the same day the State filed a notice of interlocutory appeal from the order. The cause is now before this Court upon interlocutory appeal and the sole point for determination here is whether Judge Maxwell committed reversible error in ordering that the confession be suppressed. He was of the opinion that, upon the salient facts presented to him at the hearing, the case was ruled by Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. We agree and affirm.
There can be no question but that, at the time Alford was under interrogation intermittently by the Sheriff’s men and the police officers during the afternoon of March 13th and the early morning of March 14th, and later at the office of polygraph operator Williams, culminating finally in the confession, such was an in custody interrogation. Indeed, the State at the hearing admitted he was in custody. He was first arrested at his place of employment by police officer Alfonso who told him that the Sheriff’s office wanted to question him about an “enticing” charge, which later was admitted to be spurious. Officer Alfonso actually had a warrant containing such charge in his pocket but did not bother to serve it.
All the officers, both city and county, began questioning him at the County jail about the murder of Kathleen Martin the same day he was arrested. Prior to the confession he was never in the jail on any professed charge except that of vagrancy, which Lt. Cooper, the officer in charge of investigation, admitted was “simply a subterfuge that is used in order to hold persons for investigation”. He was never permitted bond. He was never taken before a magistrate. He was never given a preliminary hearing.
He was never given the cautionary admonitions and warning by the interrogating officers that is encumbent under Escobedo and Miranda. The only time any pretense of such warning was given was when police officer Alfonso took Alford in custody on a charge of “enticing”, which in no way could be the equivalent of the indis-pensible cautionary warning required of the interrogating officers on the murder charge upon which he was actually arrested and upon which he was interrogated and held in custody.
He was never told he could have a lawyer. In fact, he was denied direct access to a lawyer before the confession was procured. His own lawyer could not see him until about three hours after demanding such right (although he had been promised such right “in about five minutes”) and then only after the confession had been obtained. At the time the attorney demanded access with his client he distinctly told the chief investigating officer “I don’t want him interrogated any more.”
It was only after he went later to a local Circuit Judge that he was able to reach Alford, who had been held incommunicado and not bondable for some 27 hours. Once during that time he had been required to strip naked in front of Capt. Heinrich and another officer.
We are of the opinion that this case comes squarely within the rationale of Escobedo and Miranda, as well as Collins v. State, Fla.App.1967, 197 So.2d 574, and Williams v. State, Fla.App.1966, 188 So.2d 320, decided by this 2nd District Court.
The interlocutory order appealed from is affirmed.
LILES, Acting C. J., concurs.
McNULTY, J., concurs specially with opinion.