**Joe Pat ANDERS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 41627.**

Court of Criminal Appeals of Texas.

Sept. 23, 1969.

Chappel & McFall, by John R. McFall, Lubbock, for appellant.

Jack Young, Dist. Atty., Muleshoe, and Leon B. Douglas and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

MEADE F. GRIFFIN, Special Judge.

The appellant was convicted of the offense of burglary. Also, under proper allegations and proof, the jury found he had theretofore been convicted of the offense of burglary, and his punishment was fixed in this case at 12 years' confinement.

This is a companion case to Arcadio (Harvey) Ysasaga v. State, 444 S.W.2d 305, No. 42,067, decided by this Court May 28, 1969.

That case was a circumstantial evidence case and was reversed by this Court because of the failure of the State to call as a witness "a Spanish boy" who had received and transmitted the money paid by Buckman and Faulkner for ten cases of Treflan which had been taken from a warehouse at Clay's Corner, in Parmer County, Texas, when it was burglarized on the night of January 11, 1967. There was a total of 49 cases and 11 quarts of Treflan, referred to in the record as 50 cases, taken from this warehouse on the night of the burglary. Each case contained 12 quart cans, and each of the cases

and the cans had stamped thereon the identifying lot number, L–2113. The ten cases sold on the night of January 12, 1967, to Buckman and Faulkner were delivered in Hockley County, Texas, and were taken from a late model red and white Chevrolet pickup. The license number on this pickup was issued to Ysasaga as owner. In this pickup were two shadowy male forms which are unidentified by this record. These ten cases and cans were marked by the identifying "Lot No. L–2113."

There were no witnesses to the burglary and no testimony from anyone to show that appellant, Anders, or the red and white Chevrolet pickup were ever at or in the vicinity of the burglarized warehouse at any time.

■ Being a circumstantial evidence case, the State must rely upon the rule that unexplained possession of recently stolen property is sufficient to sustain a conviction of the defendant for the burglary of the warehouse from which the stolen property was taken. Ysasaga v. State, No. 42,067, supra, and the authorities therein cited.

The next time we hear of any Treflan allegedly taken in the burglary of the warehouse at Clay's Corner was on the 16th of January, 1967. About 5 or 5:30 that afternoon some man called Ruben Brock, Jr., a farmer living in Lamb County, Texas, and asked him if he wanted to buy some Treflan at $70.00 per case. Brock replied that he would take ten cases at that price. The voice told Brock he would deliver the ten cases to Brock's farm residence the next night and that Brock was to pay the $700.00 consideration in cash. Brock called a Mr. Neil Wood, a farmer of that vicinity, and asked Mr. Wood if he wanted to buy the ten cases at $70.00 per case, all cash, and if he would bring the cash to Brock the next afternoon. Wood agreed. The evidence shows that the well known and generally recognized price of Treflan was $8.50 per quart

can, or $102.00 per case of 12 quart cans. Wood brought Brock the $700.00 cash on the 17th and gave it to him. About 8:30 or 9:00 P.M. on the night of January 17, 1967, Anders drove up to Brock's residence in a '55 or '56 blue-black *Chevrolet sedan* with the ten cases of Treflan. Anders was alone in the car. Brock gave Anders the $700.00 cash, and the two of them unloaded the ten cases from Anders' car into the back of Brock's pickup, and Anders then drove off. Brock immediately called Wood, who came in his pickup, and he and Brock took the ten cases and loaded them in the back of Wood's pickup and Wood drove off.

Treflan is a pre-emergence selective herbicide, which when applied to the land, prior to planting, on which cotton or sugar beets are to be planted, will kill the weeds but neither of the two crops. At this time, Wood was preparing the seed bed for his 1967 cotton crop and he used most of the ten cases before he was contacted by the officers about the Treflan he purchased and told it might have been taken in the burglary at Clay's Corner. At least five of the ten cases he received from Brock, and which Brock testified he purchased from Anders, were fully identified as being marked Lot No. L–2113, and having other distinctive markings on the cases put there by an employee of the owner of the Treflan prior to the time it was taken from the warehouse on the night of January 11, 1967.

The ten cases sold to Buckman and Faulkner by the "Spanish boy" on the night of January 12, 1967, at $75.00 per case, and the cases used by Mr. Wood were the only cases identified as coming from the warehouse at Clay's Corner.

The record is void of any testimony connecting appellant Anders with the ten cases sold to Buckman and Faulkner. We will not refer further to them.

About ten days after Brock purchased the Wood ten cases, he purchased 40 cases of Treflan from Anders for $35.00 per

case. A short time later, he purchased 13 more cases of Treflan at a price of $35.00 per case, and then an additional 10 cases from Anders at $35.00 per case. This makes a total of 63 cases of Treflan Brock purchased from Anders. The 40 cases purchased were delivered by Anders, and he was accompanied by a Spanish speaking man, called Harvey. The two of them were in a red and white Chevrolet pickup and it appeared to be the same pickup from which the ten cases of Treflan were delivered to Buckman and Faulkner on January 12, 1967. None of the Treflan in the 40 cases, the 13-case purchase or the 10-case purchase was identified as having been in the warehouse at Clay's Corner the night of the burglary, nor taken therefrom.

It looks suspicious that Anders would have sold these cases of Treflan at much less than the market price, would have demanded cash for them, and would have delivered them during the nighttime. However, the suspicious circumstances do not constitute *direct* evidence that Anders burglarized the warehouse at Clay's Corner on the night of January 11, 1967, nor prevent the case from being a circumstantial evidence case.

■ The State's case does not meet the requirements of sufficient evidence to sustain the conviction. 24 Tex.Jur.2d 422, Sec. 742. The evidence shows that the "Spanish boy" who negotiated the purchase of the ten cases of Treflan by Buckman and Faulkner could have identified the two "shadowy forms" in the red and white Chevrolet pickup, registered to Harvey Ysasaga. This "Spanish boy" evidently was well acquainted with the two men in the pickup and they with him as they allowed him to act as "contact man" and transmit the cash purchase price for the Treflan. The State did not call him as a witness, neither was his absence explained or accounted for. In such situation, circumstantial evidence that is not strong is held to be insufficient to sustain a conviction. 24 Tex.Jur.2d 427, Sec.

745; Hollingsworth v. State, (1967) Tex. Cr.App., 419 S.W.2d 854; King v. State, Tex.Cr.App., 396 S.W.2d 409; Ramirez v. State, 163 Tex.Cr.R. 109, 289 S.W.2d 251, 261 (1956).

This cause is reversed and remanded to the trial court for retrial.

In view of the necessity of another trial, we will write on two of appellant's other points of error.

Appellant complains that under this record Brock was an accomplice witness as a matter of law, and he requested the trial judge to so charge the jury. This the trial judge refused to do, but submitted a charge to the jury inquiring whether or not Brock was an accomplice witness. The trial judge gave appropriate definitions and instructions in connection with this fact issue, and appellant has no complaint as to these. His sole complaint about this charge is that there is no fact issue to be decided and the court should have charged the jury that, as a matter of law, Brock was an accomplice witness.

In Ysasaga v. State, supra, the Court of Criminal Appeals held that Brock was an accomplice witness as a matter of law. In the case at bar Brock is shown to have purchased from Anders and sold to various farmers an additional 63 cases of Treflan. Five of these cases were identified by the Lot No. L–2113 as having been taken from the warehouse at Clay's Corner when it was burglarized on the night of January 11, 1967, and as a part of the ten cases purchased by Wood from Brock. This additional evidence as to Brock's connection with Anders and with the stolen property is much stronger than in Ysasaga.

■ We hold Ruben Brock, Jr. was an accomplice witness as a matter of law, and sustain the appellant's point assigning error because the trial court failed to so charge the jury.

Appellant also complains of the admission in evidence, over his objections, of the testimony of one Bogard, a Hockley

County Deputy Sheriff. Bogard lived at, and worked out of, Anton, Texas. He was one of the officers who arrested Anders when he was first indicted for the burglary, and he and Ranger Renfro delivered Anders to the Sheriff of Parmer County, Texas, to answer that charge.

Bogard testified: "I asked Joe Pat, I said 'Pat, can they convict you' [Referring to the burglary of the warehouse at Clay's Corner] and he says 'I don't see how they can there in Parmer County, because they will have to have some farmers there on the jury, and I don't see how them farmers can convict me for taking something from somebody that was actually stealing from them, and selling it to them for what it was worth.' "

Anders' counsel was not present during any part of the conversation.

Before the trial judge ruled on the admissibility of the above statement, and permitted it to be introduced in evidence to the jury, he excused the jury from the courtroom and had an extensive preliminary hearing at which both Bogard and Anders testified, and were fully examined by their own counsel and vigorously cross-examined by opposing counsel. The following is a summary of the testimony heard by the trial judge and out of the presence of the jury. Deputy Bogard testified he lived at Anton, Texas, and that Joe Pat Anders was frequently seen on the streets of Anton. He and Anders had known each other for approximately one year and had previous conversations there in Anton. An Anton used car dealer who had heard that Anders wanted to sell a pickup he owned for $250.00 had talked with Bogard about a week or ten days prior to the conversation in question and had asked Bogard to tell Anders, the first time he saw him in town, that if Anders still wanted to sell a pickup for $250.00, the dealer was interested in buying it. Within a short time, Bogard did see Anders at a filling station there in Anton where Anders trades and his car was on the service rack being serviced. Bogard went to Anders and asked him if he still wanted to sell the pickup. Anders replied that "I can't hardly now," and proceeded to tell Bogard about a lawyer he had employed in Odessa and the attorney fee he paid him, and about another lawyer in Lubbock Anders had employed and the fee he paid him and how much it cost him to post bond in Parmer and Bailey Counties. Bogard further testified that Anders told him there was no need for Bogard to worry over it as he would not bother anything in Hockley County. At this point, Bogard testified about the conversation in question. He testified that Anders was not under arrest, nor was he placed under arrest at that time, and that he and Anders had a conversation that lasted 3 or 4 hours and then Anders went on his way. On cross-examination, Bogard again testified that the reason he stopped Anders and engaged him in conversation was to inquire about the pickup. Anders' counsel asked Bogard if, at the time he arrested Anders on this charge, he and Ranger Renfro stayed while the indictment was read to Anders and while (they) "gave him all these warnings and all that?" Bogard said, "No," that as soon as he had turned Anders over to the Parmer County authorities he and the Ranger returned to their homes. Bogard further testified that he did not mention his conversation to any of the lawyers in the case until the District Attorney and the Sheriff of Parmer County came to Anton to talk with him on Wednesday of the week before the case was being tried and that he was first subpoenaed as a witness after this talk with the officers. He said he had talked with Ranger Renfro on occasion when Renfro would stop in Anton. Bogard also testified that he asked Anders about the case and that he was trying to trap Anders into saying something about the case that would be of value to the State in securing a conviction. He further testified that when Anders said he wouldn't bother anything in Hockley County "I said: 'Well, Pat, I appreciate that,' and this, that, and the

other, but I said, 'When it comes down to it, it will be me or you, if I have, you know any say-so.'" That Anders answered, "Well, I understand that. That is all part of the game." Bogard further testified: "Sir, we talked there three or four hours about everything in the world, three or four hours, and I don't really know which question came first, or this, that and the other, but that was the topic of our conversation."

In answer to the question: "In other words, you were just trying to talk to Pat about everything else, and make him think he had a friend there, and get him to admit something, is that right?" "A. Yes, sir. Q. Sir? A. Yes, sir, I would like for him to admit anything. Q. So you could testify against him? A. Yes." He said he was not really trying to pin Anders down on this case, but just asked him if they could convict him, but he was trying to get Anders to incriminate himself; he was trying to find out something; that he is still a friend of Pat's and liked him but would not testify to something that did not happen.

Joe Pat Anders, the defendant, testified that the conversation did not last over thirty minutes to an hour and a half. He denied making the statement in question, but testified that he denied any guilt. He testified that his attorney had advised him not to make any statement at all. He said he had no idea that Deputy Bogard was trying to go into the case. He testified he did not want to sell his pickup and nothing was said about a sale in the conversation. He said Bogard asked him "how I was going to come out in that case over there" and that he answered, "Well, you ought to know more about it than I do," and then he asked Bogard, "What all have they got on me over there?" and Bogard answered, "Gosh, I don't know. You know quite a bit more about that than I do." In answer to a question from his counsel, Anders said, "I knew he wasn't my friend when he came up there. I knew better than talking to him. I was trying to get along with

him. I go over there all the time, and I didn't want him arresting me everytime he saw me, and I just spoke to him * * *. I was just trying to get along with him." He testified that Bogard never gave any indication whatsoever that he was trying to gather up evidence against Anders in talking with him. In answer to a question by the District Attorney: "You didn't consider him your friend, did you?" Anders answered: "Well, no * * * that 'friend' can be a lot of things. It can be a close friend, or a policeman friend, or—I have never considered a policeman too much of a friend. I have never been arrested by him." He was asked: "So you weren't shocked by him trying to hold himself out as a friend so you would tell him something?" and "You knew better than that didn't you?" A. "I have never told one of them anything yet."

After the hearing, the trial judge permitted the introduction only of the question and answer, and the immediate circumstances at that time and place.

We fail to find anything misleading, underhanded, or any effort to take advantage of Anders or the existence of any fact which was known to the deputy and not known to appellant prompting Anders to engage in the conversation. Anders was not in custody, but had made his bond and was perfectly free to come and go as he wished. He knew he was not talking to a friendly officer, and so testified. We are unable to find anything said or done which would in any way interfere with Anders having a fair trial of the case on the merits. Bogard, the only other witness, was present at the trial, was a sworn witness and testified as to the conversation, and was cross-examined by appellant's counsel as much as he desired. Only the exact conversation and the bare bones of the circumstances leading up to and surrounding the conversation were admitted in evidence to the jury. We find this action of the trial court is not contrary to the declaration of the United States Supreme Court in the Massiah case [Massiah

v. United States], 377 U.S. 201, 12 L.Ed. 2d 246, 84 S.Ct. 1199 (1964), as applied in later cases by that Court. In discussing the right of a defendant to be represented by counsel at any pretrial confrontation of the defendant, formal or informal, the Court said in United States v. Wade, 388 U.S. 218, on page 227, 87 S.Ct. 1926, on page 1932, 18 L.Ed.2d 1149, on page 1157 (1967):

"In sum, the principle of Powell v. Alabama [287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932)] and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of the counsel at the trial itself. It calls upon us to analyze whether potential substantive prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice."

On the same day Wade was decided, the U. S. Supreme Court also decided Gilbert v. California, 388 U.S. 263, 87 S.Ct.1951, 18 L.Ed.2d 1178; and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

Our holding on the Massiah point is, we think, consistent with and follows the reasoning in Stovall. Stovall was convicted and given the death penalty by a jury in the State Courts of New York. The New York Appellate Court affirmed. Wade was decided, and shortly thereafter Stovall applied to the Federal District Court for the Southern District of New York for a writ of habeas corpus on the ground that he did not have counsel present at an inroom hospital identification by the deceased's wife, who was present and saw the killer when her husband was killed and she was knocked to the floor by the attacker and stabbed eleven times. The wife was confined in the hospital and had major surgery the day after the murder in order to save her life. About noon on the second day after the killing, and the next day after the surgery, five or six police officers and two members of the district attorney's staff brought the accused Stovall into the wife's room for her to view the accused. He was the only Negro in the hospital room and was handcuffed to one of the officers. Also, the officers required the accused to speak a few words for the purpose of voice identification. One of the officers asked the wife "if he was the man." The wife identified Stovall as the killer. She recovered and testified in the trial of Stovall, telling about her identification of him in the hospital. She also identified Stovall from the witness stand as the killer. The U. S. Supreme Court affirmed. Its decision was based on (1) the refusal to apply the rules announced in Wade and Gilbert retroactively to Stovall since his conviction was prior to the announcement of such rules, (2) that the hospital room confrontation was not so unnecessarily suggestive as to violate due process of law. We do not have a confrontation for identification purposes in our case. In its opinion, the Supreme Court quotes from the Circuit Court of Appeals' opinion (355 F. 2d at 735) as follows:

"Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, 'He is not the man' could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question."

From the above authorities it appears to us that the Massiah rule has only been applied to reverse a case (1) where the defendant was in custody at the time the questioned evidence was elicited from him by the police, and (2) where the defendant was on bond and he was the subject of some subterfuge; betrayal by a friend; the presence of a radio transmitter, unknown to defendant but known to the police and the other party to the conversation; the secret presence of the police, again unknown to defendant but known to his confidant, or some other form of trickery. In short, conduct on the part of the police which the appellate court considers unfair and which denies a fair trial to the defendant. We do not find any such condition or conduct in this case.

For the errors pointed out above—this cause is reversed and remanded to the trial court for re-trial.

WOODLEY, Presiding Judge (concurring).

I concur in the opinion prepared by Special Judge Meade F. Griffin.

As further ground for overruling the contention that the admission of appellant's statement was not reversible error under the Massiah rule, I would add the following.

Ground of error No. 1, which presents the contention that the admission in evidence of appellant's statement violated his constitutional rights under Miranda, makes no contention that the statement was inculpatory or incriminating.

The ground of error reads:

"The court erred in admitting in evidence an oral statement given by the appellant to a police officer after indictment in the absence of counsel and at a time when the appellant had employed an attorney."

The statement under the ground of error quotes the statement to which it refers as follows:

"Q. (Bogard) So I said 'Pat, are they going to convict you?' And he said: 'I don't see how they can.' He said 'over there at Parmer County, they will have to have farmers on the jury.' And said: 'Any time they do.' He said, 'I can't see how a farmer can convict me of taking something from somebody that was stealing from them and selling it to them for what it was worth.'"

The statement in support of the ground of error No. 5, which complains that the evidence was insufficient to corroborate the testimony of the accomplice witness Brock, includes the following:

"The conversation that the appellant had with Officer Brock cannot be considered corroboration of Brock due to the very nature of the statement made."

The argument in support of ground of error No. 5 includes the following:

"The testimony of Officer Bogard as to statements made to him by appellant would furnish no corroboration for at most it would only show an opinion by the appellant as to why a jury in Parmer County would not convict him, but would fail to show any incriminating evidence as such."

In Massiah the Supreme Court dealing with incriminating statements obtained by trickery or deception said:

"All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial."

Appellant's able counsel concedes, and I agree, that the statement is neither a confession or admission of guilt, nor is it incriminating. As I see it, the statement was neither inculpatory nor exculpatory.

The question is whether the Massiah rule should be extended in this state to exclude the statement, whether incriminating or not, and whether obtained by trickery or deception or not.

It is my view that it should not, and I direct attention to the fact that such a holding in this appeal would not be subject to review by the Supreme Court by appeal or certiorari, the conviction being reversed on other grounds.

I would also direct attention to the fact that the rule which requires the appellate court to treat this and the companion case of Ysasaga v. State as showing reasonable doubt of the sufficiency of the evidence[1] presupposes that the appellate court has found that there is sufficient evidence from which the jury might reasonably conclude that every other reasonable hypothesis than guilt was excluded and absent the rule applied[2] the evidence in each case is sufficient to sustain the conviction.[3]

I do not understand that the sufficiency of the evidence herein, absent the rule applied in Ysasaga v. State, supra, rests in any way on the statement of appellant to Deputy Sheriff Bogard.

1. 24 Tex.Jur.2d 427, Evidence, Sec. 745.

2. See Footnote 1, supra.

3. This is important in view of the fact that in the event of another trial the state may not be able to introduce the testimony of the "Spanish boy", but may satisfactorily account for its failure to do so or show that neither the Spanish boy nor his testimony was in fact available to the prosecution, or that it would not have cast additional light on the facts.

1. In 24 Tex.Jur.2d, Evidence, Sec. 745, p. 427, it is written:
   "Where the circumstantial evidence relied on by the prosecution is obviously weak, and where the record on appeal affirmatively shows not only that other testimony which would have cast addi-

## OPINION

ONION, Judge (concurring in part, dissenting in part).

I concur in the result reached, but feel compelled to explain my position in so doing, particularly in the event of a retrial. The majority reverses this case upon the rule stated in 24 Tex.Jur.2d, Evidence, Sec. 745, p. 427,[1] which was cited by this court in Ysasaga v. State, 444 S.W. 2d 305 (No. 42,067). This rule, as I understand, has application only where the circumstantial evidence relied upon by the State is obviously weak. In applying this rule in the case at bar the majority does so without any mention or discussion of the incriminating oral statement by the appellant which they later hold admissible or its effect upon the rule in question. I would have preferred that the majority had done so.

My primary reason for agreeing to a reversal in this case is my conclusion that the appellant is correct in his claim that the trial court erred in admitting into evidence the incriminating statement allegedly made by the appellant to a police officer after indictment and at a time when appellant had employed an attorney.[2] As authority

tional light on the facts was available to the prosecution, but also that the prosecution did not introduce such other evidence or satisfactorily account for its failure to do so, the appellate court will treat the case as one showing reasonable doubt of the sufficiency of the evidence to support the conviction."
   See also Hollingsworth v. State, Tex. Cr.App., 419 S.W.2d 854; King v. State, Tex.Cr.App., 396 S.W.2d 409; Ramirez v. State, 163 Tex.Cr.R. 109, 289 S.W. 2d 251.

2. Deputy Sheriff Bogard related that during the conversation the following occurred: "So I said, 'Pat, are they going to convict you?' And he says: 'I don't see how they can there in Parmer County, because they will have to have some farmers there on the jury, and I don't see how them farmers can con-

for his contention appellant relies upon Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246.

The statement in question was introduced after a hearing in the absence of the jury to determine its voluntariness and admissibility.

The record reflects that such incriminating statement was made during a conversation initiated by Deputy Sheriff Jake Bogard of Hockley County when he knew that appellant was under indictment in Parmer County and on bail and after he learned appellant had employed counsel in the case at bar. Bogard testified he observed appellant in a service station on Main Street in Anton, Texas, and began the conversation by inquiring about the possible sale of appellant's pickup truck. He related that during their three to four hour discussion of various subjects he turned the conversation to the case at bar and the incriminating statement followed. Bogard's purpose, he revealed, was to trap the appellant into saying something, while pretending to be a friend, to get him to incriminate himself so he (Bogard) could testify against him. Bogard admitted that no warnings as to appellant's rights were given. He testified the appellant was not under arrest and left when the conversation terminated.

Testifying in absence of the jury, appellant acknowledged the conversation but denied making the incriminating statement attributed to him. He testified his lawyer had told him not to make a statement to anyone; that he knew any statement made when not under arrest was admissible against him; that he knew Bogard was an officer and "wasn't my friend"; that he engaged in the general conversation to "get along" so Bogard would not arrest him every time he came to Anton.

In Massiah v. United States, supra, the defendant was indicted with other persons for violating the federal narcotic laws, retained an attorney, pleaded not guilty, and was released on bail. While free on bail Massiah had a conversation in the absence of counsel with one Colson, a co-defendant, while sitting in Colson's automobile, unaware that with Colson's cooperation a recording device had been placed in the automobile by means of a federal agent nearby who listened to the conversation and subsequently testified to incriminating statements made by the defendant.

Finding that Massiah had been deprived of his Sixth Amendment right to the assistance of counsel, the Court said:

"We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.[3]

\* \* \* \* \* \*

"We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted.

vict me for taking something from somebody that was actually stealing from them and selling it to them for what it was worth.' "

The foregoing is the statement testified to *before the jury* and thus in my opinion, is the controlling version.

3. One of the cases cited by the majority in Massiah was Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. There the court unanimously overturned a conviction based on a confession the court found to be involuntary. Spano's confession was obtained after extensive interrogation; a policeman acquaintance also participated in a way which the court denominated as deceptive. The concuring justices believed that interrogation by police in absence of the indicted person's attorney itself directly impaired his constitutional right to counsel and required exclusion of the confession on that basis alone. This rationale was in fact invoked by the majority in Massiah.

All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial."

Massiah thus reiterated the specific guarantee of the Sixth Amendment that one is entitled to the aid and assistance of counsel not only during the trial but also during the critical period immediately preceding from the time of indictment to time of trial.

It has been said that no uniformity now exists in the case law as to the exact meaning of the Massiah opinion. See People v. Milani, 39 Ill.2d 22, 233 N.E.2d 398 (Ill.). This is perhaps an understatement of some proportion.

Some federal courts of appeals interpret Massiah as establishing an exclusionary rule only for incriminating post-indictment statements by a defendant which are induced or deliberately elicited by police officers or their agents in the absence of counsel. See United States v. Accardi, 342 F.2d 697 (2nd Cir.); United States v. Gardner, 347 F.2d 405 (7th Cir.); Stowers v. United States, 351 F.2d 301 (9th Cir.); United States v. Garcia, 377 F.2d 321 (2nd Cir.).

None of these decisions appear to have given any consideration to the United States Supreme Court's decision in McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed. 2d 682, which tersely reversed the Supreme Court of Ohio (State v. McLeod, 1 Ohio St.2d 60, 203 N.E.2d 349) citing Massiah. Ohio's Supreme Court had earlier been told to reconsider McLeod in light of Massiah (378 U.S. 582, 84 S.Ct. 1922, 12 L.Ed.2d 1037). When they did they attempted to limit the scope of Massiah to statements which are deliberately elicited from an accused by an informer who has agreed to

cooperate with the prosecution.[4] This narrow interpretation was reversed with Massiah cited as authority for excluding the spontaneous, voluntary, post-indictment oral confession which was made, before counsel was retained or appointed, to the sheriff and a prosecuting attorney while the indicted defendant McLeod was riding in their automobile looking for the gun used in the holdup.

The First Circuit Court of Appeals, taking note of the earlier federal decisions, interpreted the Supreme Court action in McLeod, however, to mean that the Messiah rule is not limited to Massiah "circumstances," "but applies to exclude post-indictment incriminating statements of an accused to government agents in the absence of counsel even when not deliberately elicited by interrogation or induced by misapprehension engendered by trickery or deception." Hancock v. White, 378 F.2d 479, 482 (1st Cir.). The defendant White, while in custody, had volunteered incriminating statements to the sheriff and county attorney when he knew, by his own admission, that he did not have to talk to the officers. White admitted initiating the conversation to get a "deal" if he pleaded guilty, but like the appellant Anders here, he denied making the incriminating statement. The Court felt the case, however, was indistinguishable from McLeod on the facts and that the prediction of the dissenting justices in Massiah had come true—that the rule of that case applies more broadly than the facts of Massiah would suggest—even to cases involving neither interrogation nor any form of deceit or deception.

In Beatty v. United States, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48, the Supreme Court reversed the Fifth Circuit Court of Appeals (377 F.2d 181) citing Massiah. The Beatty facts are remarkably similar to Massiah except that the defendant had initiated the meeting and conversation with

---

4. The Ohio Supreme Court said: "A decision which would extend such a rule (Massiah) beyond where it has already been extended would be required in order to reverse the judgment in this case." The United States Supreme Court evidently did not agree.

the informer cooperating with the government and was not induced or encouraged by the informer to talk. Such action seemingly confirms the interpretation given Massiah by the First Circuit Court of Appeals in Hancock. See People v. Milani, supra; People v. Lagardo, 39 Ill.2d 614, 237 N.E.2d 484 (Ill.).

A number of states have found the Massiah rule violated when applied to the facts presented. State v. Witt, 422 S.W.2d 304 (Mo.); Williams v. State, 188 So.2d 320 (Fla.App.) citing numerous authorities; State v. Longmore, 178 Neb. 509, 134 N.W. 2d 66 (Neb.); Commonwealth v. McCarthy, 348 Mass. 7, 200 N.E.2d 264; State v. Gallagher, 97 Ariz. 1, 396 P.2d 241 (where after charges filed, officers told the accused they were in his hospital room strictly on a friendly, social level); State v. Herman, 3 Ariz.App. 323, 414 P.2d 172. See also Cooper v. Commonwealth, 205 Va. 883, 140 S.E.2d 688.

In 1964 this court in Turner v. State, 384 S.W.2d 879, held admissible a confession obtained after indictment in absence of counsel, distinguishing Massiah. Appellant urges that Turner is no longer controlling. It is true that much water has passed under the bridge and many of the underpinnings of that decision have been stripped away.

While Massiah was a federal prosecution, its doctrine has now been held applicable to the states through the Fourteenth Amendment. McLeod v. Ohio, supra. See also Duncan v. State, 278 Ala. 145, 176 So.2d 840; Williams v. State, 188 So.2d 320 (Fla. App.); Commonwealth v. Coyle, 427 Pa. 72, 233 A.2d 542 (Pa.); Elliott v. Warden, Maryland Penitentiary, 243 Md. 627, 222 A.2d 55; State v. Blanchard, 44 N.J. 195, 207 A.2d 681. See also 79 Harvard Law Review 935, 999 (1966). And, it does not

now appear that Massiah can any longer be restricted to its particular facts.[5]

Further, we now know that when the constitutional right of counsel arises a request therefor is not essential. Miranda v. Arizona, 384 U.S. 436, at p. 471, 86 S.Ct. 1602, at p. 1626, 16 L.Ed.2d 694; See also Swenson v. Bosler, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33; People v. Lilliock, 62 Cal.2d 618, 43 Cal.Rptr. 699, 401 P.2d 4; Lee v. United States, 322 F.2d 770 (5th Cir.).

And Lyles v. Beto, 329 F.2d 332 (5th Cir.) cited as support for the conclusion reached in Turner, was reversed for reconsideration in light of Massiah. 379 U.S. 648, 85 S.Ct. 613, 13 L.Ed.2d 552. See now Lyles v. Beto, 363 F.2d 503.

Only this year the Third Circuit Court of Appeals held that in light of the Supreme Court's action in McLeod that Massiah commands an absolute right to counsel after indictment and all oral communications between defendant and the police made after indictment in absence of counsel are inadmissible. United States ex rel. O'Connor v. State of New Jersey, 405 F.2d 632. See also State v. Green, 46 N.J. 192, 215 A.2d 546.

In United States ex rel. O'Connor v. State of New Jersey, the Court stated:

"Massiah left three important questions unanswered: (1) Was it applicable only to federal prosecutions? (2) Was it restricted to special 'circumstances' or did it confer an absolute right to counsel in all cases following indictment? (3) Was it to be applied retroactively?

"The first of these questions was answered in Lyles v. Beto, 379 U.S. 648, 85 S.Ct. 613. 13 L.Ed.2d 552 (1965). The defendant in Lyles had been convicted of burglary in a state prosecution. His ex-

---

5. In addition to McLeod, Beatty and others, the Supreme Judicial Court of Massachusetts, in Commonwealth v. McCarthy, 348 Mass. 7, 200 N.E.2d 264, said: "In the Massiah case the defendant did not know that his remarks to a confederate who was coöperating with

the authorities were being overheard. But we do not understand the holding to turn on that point. The court in general terms stated a rule against interrogation after indictment in the absence of counsel. This is now a constitutional principle applicable to these cases."

trajudicial confession given after indictment while not represented by counsel was introduced at trial. Relying on Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958) and Cicenia v. LaGay, 357 U.S. 504, 507, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958), the Fifth Circuit held that there was no absolute right to counsel after indictment which, absent a showing of special circumstances, vitiated the validity of voluntarily-given statements by the accused.

"Without opinion, the Supreme Court remanded the case 'for reconsideration in light of Massiah v. United States'. The clear implication of this action was that Massiah applied to both federal and state prosecutions.

"Whether Massiah would be applied selectively to special 'circumstances' was a question that remained, but one which was to find an answer in McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965). Convicted in an Ohio prosecution, McLeod challenged the admission of his extrajudicial statements made voluntarily after indictment without counsel. The incriminatory remarks were unsolicited by the police without any element of trickery, deception or subterfuge.

"The Ohio Supreme Court dismissed the appeal as presenting 'no debatable constitutional question'. The United States Supreme Court granted certiorari and, as it had done in Lyles, remanded the case for 'consideration in light of Massiah v. United States'.

"On remand, the Ohio court, with two justices dissenting, determined that because McLeod's statements were volunteered without police solicitation, there being no circumstances of trickery or subterfuge present, the rule of Massiah was not controlling. The Supreme Court again granted certiorari and reversed the conviction without opinion 'on the authority of Massiah v. United States'. 381 U.S. 356, 85 S.Ct. 1556.

"By its disposition of McLeod the Court has said, in effect, that Massiah commands an absolute right to counsel after indictment, thereby vitiating the validity of all oral communications between the defendant and the police made in the absence of counsel. The 'investigatory v. accusatory' test of Escobedo and the 'in custody' test of Miranda, employed to determine when the right to counsel attaches, have no application once the indictment has formally stamped the suspect as *the* defendant; only a clear, explicit, and intelligent waiver may legitimate interrogation without counsel following indictment."

It seems clear from the above discussion that whether one adopts a strict interpretation, takes a liberal view or seeks the middle ground the admission into evidence of the incriminating statement allegedly made by appellant and related by Officer Bogard was in violation of the Massiah rule. By his own candid admission Bogard premeditatively approached the appellant with the intention and design to induce him to make incriminating statements relative to the charge for which he was under indictment while unaided by counsel.

Massiah is not to be construed as immunizing a defendant from normal investigative technique after indictment, United States v. Edwards, 366 F.2d 853, 873 (2nd Cir., 1966). Its rule is aimed at protection against deliberate efforts of law enforcement agents which are specifically designed at eliciting incriminating statements relative to the crime under indictment.

It is true that Massiah is not violated when if the person hearing the statement is not a government agent at the time the statement is made, Paroutian v. United States, 370 F.2d 631, cert. denied 387 U.S. 943, 87 S.Ct. 2077, 18 L.Ed.2d 1331, and no police inspired conversations are involved, People v. Milani, supra; or if a government agent is unaware of the indictment, United States v. Garcia, 377 F.2d 321 (2nd Cir., 1967), or if the government agent is present

on other business and the defendant makes spontaneous or voluntary statements, United States v. Accardi, supra, or if the statement is an isolated one as to past crime gratuitously made while not under interrogation in connection with statements relative to fresh criminal activities which undercover officers are properly pursuing. Gascar v. United States, 9 Cir., 356 F.2d 101.

The fact that Deputy Bogard was an out of county peace officer and not prompted in this action by prosecutorial authorities does not by virtue of that fact bring him within any of the foregoing categories.

It would appear that the special aspect of counsel in Massiah is subject to waiver along with the waiver of Miranda rights. Coughlan v. United States, 391 F.2d 371 (9th Cir., 1968). Cf., however, People v. Vella, 21 N.Y.2d 249, 287 N.Y.S.2d 369, 234 N.E.2d 422, which refused to accept such a waiver theory.

I cannot, however, conclude that the State has here demonstrated an affirmative waiver, even under the "totality of the circumstances" rule discussed and applied in McCandless v. State, Tex.Cr.App., 425 S.W.2d 636. It is well established that the "waiver" referred to may be defined as "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. Further, waiver of constitutional rights will not be "lightly inferred" and courts will " 'indulge every reasonable presumption against [the] waiver' of fundamental constitutional rights." Johnson v. Zerbst, supra. Miranda teaches, of course, that a heavy burden rests upon the prosecution to demonstrate a "voluntary, knowing and intelligent" waiver of an accused's constitutional rights.

Naturally the determination of whether there has been an affirmative waiver must depend upon the particular facts and circumstances of each case. Johnson v. Zerbst, supra; Narro v. United States, 370 F.2d 329–330 (5th Cir.); United States v.

Hayes, 385 F.2d 375 (4th Cir.); McCandless v. State, supra.

Most important here, however, despite some evidence of appellant's knowledge of some of his rights, is the statement in Miranda that " * * * *any* evidence that the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege" against self-incrimination. (emphasis supplied)

The State calls to our attention Hill v. State, Tex.Cr.App., 429 S.W.2d 481, and Gunter v. State, Tex.Cr.App., 421 S.W.2d 657. Both of these cases, however, involved pre-indictment custodial interrogation after Miranda warnings were given and valid waivers were demonstrated. There was no evidence that the defendants had been threatened, tricked or cajoled into a waiver. It is true that Gunter held admissible, under circumstances there presented, a confession taken in absence of and without notification of the accused's court appointed counsel in view of the clear cut affirmative waiver. There this writer, in a concurring opinion, cautioned against the use of such as authority that an accused's counsel need not be notified or called prior to interrogation. I do not deem Hill and Gunter as here controlling.

Finding no valid waiver here demonstrated and the rule in Massiah violated, this writer would reverse on this ground alone.

I cannot agree with the suggestion in Judge Woodley's concurring opinion that the statement in question was not inculpatory or incriminating or an admission of guilt or a confession. I call attention to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, wherein the Supreme Court said:

"No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being com-

pelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' *If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution.* In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." (emphasis supplied) See also Terry v. State, 420 S.W.2d 945.

I do not agree that "[the] question is whether Massiah should be extended in this state to exclude the statement whether incriminating or not, and whether obtained by trickery or deception or not." Massiah has already been thus extended in all of the United States. McLeod v. Ohio, supra. See United States ex rel. O'Connor v. State of New Jersey, supra. To pretend otherwise is to ignore everything that has transpired since the rendition of the Massiah opinion.

It is the duty of this court to follow the holdings of the Supreme Court. I respectfully suggest we do so and follow McLeod v. Ohio, supra. Further, it is our duty to pass upon federal constitutional questions properly presented to this court. For us to affirm every such case, unless there is a proverbial "white horse" case by the Supreme Court where the facts can be perfectly color-matched and coordinated, so not to prevent review by appeal or certiorari, is in my opinion an abdication of our duty as the highest appellate court in this state dealing with the life and liberties of its citizens. To adopt such an attitude means that we will use the rubber stamp marked "affirmed" on all federal constitutional

questions where the Supreme Court has not clearly resolved the question involved to the satisfaction of the majority. I cannot agree that such attitude is correct. Nor can I agree that we should omit a discussion of a constitutional question merely because the case is being reversed on other grounds. This might easily result in the waste of precious judicial time. The district attorney in the case at bar stated in his oral argument before this court that if a reversal resulted, there would be a second trial and that the statement in question would again be used unless this court clearly informed him it was error to do so. I would so inform him.

For the reasons stated, however, I concur in part and dissent in part.

MORRISON, J., joins in this opinion.